**Robert LEONARD, et al.,**
**Plaintiffs-Appellants,**

v.

**The CITY OF COLUMBUS, et al.,**
**Defendants-Appellees.**

No. 82–8158.

United States Court of Appeals,
Eleventh Circuit.

May 23, 1983.

Rehearing and Rehearing En Banc

Denied Sept. 9, 1983.

ACLU Foundation, Neil Bradley, Atlanta, Ga., Joel M. Gora, Brooklyn, N.Y., ACLU Foundation, E. Richard Larson, New York City, for plaintiffs-appellants.

· E.H. Polleys, Jr., Asst. City Atty., Columbus, Ga., for defendants-appellees.

Before KRAVITCH, HENDERSON and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellants are former policemen of the City of Columbus, dismissed by the City for events occurring in May, 1971. In this action challenging their dismissal they assert numerous grounds for relief under the United States Constitution. The district court found merit in none of the grounds asserted. We conclude differently, holding appellants' dismissal violated their first amendment right of free speech; consequently, we reverse.

In early 1971 black members of the City of Columbus Police Department (the "Department") formed the Afro-American Patrolmen's League ("the League") in order to present effectively grievances of the black officers. At that time there was a growing tension among black officers, who perceived that the Department was treating blacks in a discriminatory manner. Specific complaints involved discriminatory hiring and promotion of blacks, discriminatory assignment and disciplinary practices, and alleged police brutality toward members of the black community. Although several black police officers had brought complaints before the Board of Public Safety, they believed no progress was made.

On March 26, 1971, the League's Executive Director, Officer Robert Leonard, issued a press release in which the League criticized Department practices. Following issuance of the release, on April 5, 1971, the League held a press conference in City Commission chambers. Subsequent to these events members of the League met with the Chief of the Department, Chief McGuffey. League members believed that neither the meeting with Chief McGuffey, nor another meeting held with the Mayor of Columbus, resulted in progress toward resolving League grievances. At no time following these events were the plaintiffs informed they were in violation of any Department regulations.

On May 29, 1971, Officer John Brooks telephoned the Department and notified the desk sergeant he would be unable to report to work due to illness. Testimony at trial indicated that the normal Department practice in such event was for the desk sergeant to arrange rescheduling of the court cases in which the officer was to testify. Instead, when Brooks failed to appear in court he was charged with contempt and two officers were dispatched to his home to arrest him. The Department then charged him with conduct unbecoming an officer and feigning sickness to avoid duty, and suspended Brooks indefinitely from the force.

One of the League's chief complaints against the Department was the disproportionately severe punishment meted out to black officers for disciplinary violations. Not surprisingly, Officer Brooks' arrest on contempt charges, undeniably an event out of the ordinary, caused great consternation among black officers. The black officers attempted to meet with and discuss the suspension with Chief McGuffey. No meeting was held, however, when the Chief insisted on hand-picking the officers he would see, rather than discussing the matter with League officials, as favored by the black officers. After attempts to pursue the matter with Department officials failed, black officers began to picket the police station on May 29 and 30. At all times the demonstrations were peaceful and orderly.[1] Department officials did not inform plaintiffs that the picketing was unlawful, or could result in their dismissal.

On May 30 black officers and various civic leaders met to discuss the increasingly tense situation. The evidence is unclear as to what, if anything, was agreed upon by those who participated in the meeting. League members testified the civic leaders and intermediaries suggested a "cooling-off" period during which the black officers would cease picketing and continue performing their duties, in return for which no charges would be brought for previous picketing. Contrary testimony suggests the civic leaders attended in an "unofficial" capacity as "ordinary citizens" and were unauthorized to promise anything. Any notion of a "cooling-off" period soon was dispelled: later that day Officer Leonard and Officer Clark, another League official, were summoned to Department headquarters where Deputy Chief Brown read a list of charges against them. Brown refused to provide a written copy of the charges, and it was unclear if, and when, the officers were to be suspended. Officer Leonard therefore returned to his beat.

---

1. There was evidence, however, that the picket violated police regulations limiting spontaneous demonstrations to groups of no more than ten individuals. Several appellants were charged with this violation in subsequent proceedings.

Angered by what League members perceived to be a violation of the "cooling-off" period, the League voted to resume picketing the next day. They also agreed to participate in the "flag incident," which gave rise to this suit. On the morning of May 31 seven officers, six of whom are appellants in this action, began to picket the Department. All officers were off-duty, but in uniform. Appellants carried signs with captions such as "WE DON'T WANT TO BE POLICEBOYS; WE WANT TO BE POLICEMEN" and "HAVE YOU EVER HEARD OF POLICE BEING ARRESTED FOR CONTEMPT OF COURT."

Later, after members of the press arrived, the picketing officers assisted one another in removing an American flag emblem from the sleeve of each uniform shirt. The flags were removed carefully, thread by thread, with a razor. At no time was the flag treated with disrespect; to the contrary, Officer Leonard, speaking for the others present, explained the high respect the officers had for the American flag and the ideals it represented, particularly liberty and equal justice for all. The officers, many of whom had served in Viet Nam, did not believe the Department had extended them just treatment consistent with these principles; accordingly, they considered it inappropriate to wear the flag on their uniform. After Deputy Chief Brown refused Leonard's attempts to present the flag emblems to him, Leonard placed the emblems in his pocket. The incident was at all times peaceful, unaccompanied by disorder, violence or boisterousness. Photographs of the incident portray the scene as peaceful.

At the time the "flag incident" was occurring an emergency conference was held at which Chief McGuffey, Joseph W. Sargis, the Director of Public Safety, and City of Columbus Mayor Allen agreed that discharge of the officers was in order. Although Chief McGuffey indicated the primary reason for the firing was the flag incident, Sargis characterized it as a "crescendo" of the activity of past days, referring specifically to prior League activities. The dismissal letter, printed below in its entirety, refers specifically, and solely, to removal of the flag patch.

Shortly after the flag incident appellants were ordered to report to the Department major's office, where they were informed of their dismissal from the force and given dismissal letters:

Effective this date, May 31, 1971, you are discharged from the Columbus Police Department for violation of Section 39, paragraphs "G" and "R" of the General Rules of Conduct of the Police Manual, which states:

(G) Conduct unbecoming an officer which might be detrimental to the service

(R) Any other act or omission contrary to good order and discipline of the department

in that you did publicly remove the American flag from the Columbus Police Uniform while picketing in front of Police Headquarters on May 31, 1971.

The American Flag was made an official part of the Columbus Police Uniform by a unanimous vote of the City Commission on August 18, 1969.

Very truly yours,
B.F. McGuffey
Chief of Police

Director Sargis then held a press conference at which he notified the press of the dismissal and included as reasons for dismissal several grounds not mentioned in the dismissal letter from Chief McGuffey. Sargis accused appellants of making "baseless allegations of unlawful conduct, racism, and discrimination" against the Department without first bringing those complaints through "channels." His statement concluded "[t]oday they picketed the Columbus City Police Department and removed the American Flag from their uniforms. These men did not enlist in the Police Department, they do not have to wear that uniform or flag again; they are dismissed." [2]

---

**2.** The Columbus City Commission, by resolution of August 18, 1969, made the American flag patch a part of the police uniform. The discharged officers maintain, however, that

On June 4 and 9, 1971, complaining of the procedurally unlawful dismissals, counsel for appellants wrote defendants stating appellants wished to preserve their right to a hearing before the Police Hearing Board. The procedure attendant appellants' dismissal apparently was contrary to every promulgated City of Columbus rule, including the city charter; Ordinance No. 71–1, which established a Police Hearing Board to perform the function usurped by McGuffey, Sargis, and Allen; and the Police Manual, which specifically requires concurrence of the Board of Public Safety (whose successor in interest was the Police Hearing Board).[3] By letter of June 10, Deputy Chief Brown informed appellants of their "right to appeal" their dismissal before the Board. In subsequent letters Brown scheduled the hearings, which were postponed once on request of appellants' counsel. The Brown letters of June 24 and 25 set forth additional charges which the Board would consider.

At the hearings appellants were represented by counsel and were given an opportunity to offer witnesses and evidence on their behalf. It was not until the day of the hearing, however, that counsel received the Department's memorandum and packet of material detailing the evidence against each witness, which evidence included a transcript of the press conference held by the League on March 26. After the hearings, the Board unanimously affirmed dismissal of appellants Leonard and White. The dismissals of appellants Smith, Pearson, Willis, and Clark were upheld by a four-to-two vote. Neither in the letters received informing appellants of the Board's decision, nor at any time thereafter, was it made clear on which charges the dismissals were upheld.

Appellants brought this suit in the District Court for the Middle District of Georgia. Initially the plaintiffs sought declaratory and injunctive relief against allegedly discriminatory employment practices of the Department, but in its current posture the six remaining appellants seek only damages for wrongful discharge, and reinstatement. After a hearing, the district court dismissed the complaint on jurisdictional and abstention grounds. We reversed and remanded for trial. *Leonard v. City of Columbus,* 551 F.2d 974 (5th Cir.1977), *aff'd en banc,* 565 F.2d 957 (5th Cir.1978), *cert. denied,* 443

they never received notice that the patch was a mandatory part of their uniform. This contention is credible: the flag patch requirement appears in no official Department order, memorandum or bulletin, and is not mentioned in the Police Manual. It is questionable whether it was ever communicated to the officers in any way. Chief McGuffey testified at trial that he instructed subordinates to notify the force, but has no idea when this was done. He further testified that when such an order is passed to the ranks, ordinarily a record is made, a copy placed in the file, and another copy posted on the bulletin board. Again, no record concerning notification of the flag patch requirement exists.

Despite this state of the evidence the district court concluded: "[i]t is obvious that someone in authority in the Department in some manner advised all members of the force of the requirement for there to have been such unanimity of action. The fact the Police Chief could not recall some years later exactly how the message was conveyed to the policemen hardly justified the conclusion that it was not done." The weight of record evidence indicates the district court's use of the word "unanimity" overstates reality. Many officers failed to wear the flag patch; in fact, one of the appellants had to pin a patch on his arm before he could take it off because his uniform shirt contained no patch. The only evidence that might indicate notice was given is the statement in a League press release "[w]e are compelled to wear the flag." That could as easily mean the patch was on the new uniforms presented to appellants as it could mean appellants were aware of the City resolution they allegedly wilfully violated. Shortly after appellants' dismissal a "reminder" of the flag rule was distributed to the police. All of the above lends doubt to the conclusion that the officers had notice of the City resolution. Because we decide the conduct was protected, we need not resolve this dispute.

3. The day after appellants' dismissal Ordinance 71–154 was introduced, and subsequently passed. That ordinance added a new section to the City of Columbus charter, explicitly permitting dismissal of officers by the Chief of Police subject to later hearing by the Police Hearing Board. The district court dismissed a due process claim based on the lack of authority underlying the dismissals, holding it was cured by a subsequent hearing held before the Police Hearing Board.

U.S. 905, 99 S.Ct. 3097, 61 L.Ed.2d 872 (1979).

In the action plaintiffs alleged the dismissal violated their first amendment rights, that the sections of the Police Manual under which they were dismissed were vague and overbroad, that the dismissals were violative of due process, and that their discharge was a result of discriminatory enforcement of the Manual's requirements, violating their right to equal protection. After a trial on the merits, the district court denied plaintiffs' claims. Again, we reverse.

■ Appellants' claim under the first amendment that they were discharged for removing the flag from their uniform, that the removal of the flag constituted symbolic speech, that the symbolic speech was protected under the first and fourteenth amendments, and that, consequently, dismissal on the basis of an exercise of a protected right was unconstitutional. The district judge denied appellants' first amendment claim, concluding that removing a flag patch from the uniform, when the patch was required by City resolution, was not symbolic speech:

> This was a calculated show of contempt for the City authority and a demonstration of refusal to obey its lawful ordinances, rules and commands. If this was not "conduct unbecoming an officer which might be detrimental to the service" and an "act contrary to the good order and discipline of the department," then the Court does not know how it could be categorized. If this was only "symbolic speech," then it might well be presumed that punching the Police Chief in the nose would also be so regarded. There was no denial of freedom of speech.

We disagree.

The law the district court should have applied derives from the decision of the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[4] In *Mt. Healthy* the Court established the test applicable to a determination of whether a decision not to rehire by a governmental body violates an employee's first amendment rights. *Id.,* 97 S.Ct. at 576. Since *Mt. Healthy* this circuit has applied a derivative test to review allegedly unconstitutional firings. *See Waters v. Chaffin,* 684 F.2d 833, 837 (11th Cir.1982); *Wilson v. Taylor,* 658 F.2d 1021, 1027 (5th Cir. Unit B 1981); *Williams v. Board of Regents,* 629 F.2d 993 (5th Cir.1980).

■ Under the *Mt. Healthy* test the plaintiff bears the initial burden of proving that his speech or conduct was a substantial or motivating factor in the decision not to hire him and that the speech or conduct was constitutionally protected. Whether the conduct or speech is protected we determine by reference to the balancing test established by the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In *Pickering* the Court stated:

> [T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected. *Keyishian v. Board of Regents, supra,* 385 U.S. [589] at 605–606, 87 S.Ct. [675] at 685 [17 L.Ed.2d 629]. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

---

**4.** The district judge decided the first amendment claim without reference to any case law and without citation to settled authority. Applying the correct legal standard we reach a conclusion different than that of the court below. We reach our conclusion, however, without disagreement as to the facts as found by the court below.

(citation omitted). Once the plaintiff succeeds in meeting his burden, the burden of proof shifts to the defendant to show, by a preponderance of the evidence, "that it would have reached the same decision to discipline the employee in the absence of the protected speech." *Berdin v. Duggan,* 701 F.2d 909, 911–12 (11th Cir.1983); *Waters v. Chaffin,* 684 F.2d at 837.

Appellants experienced no difficulty in meeting the first of their burdens, that of showing that their activity was a "substantial" or "motivating" factor in their dismissals. Appellees virtually concede as much. Chief McGuffey testified the officers were dismissed for the flag incident. Director Sargis stated that the flag incident was the culmination of a "crescendo" of activity, that he could not have seven officers act as appellants did and not dismiss them. Because the Police Hearing Board failed to make findings it is impossible to know which charges carried what weight in the decision to uphold McGuffey's decision. Nevertheless, Board members who testified at trial indicated they affirmed the dismissals on the basis of all the charges. "The opinion in *Mt. Healthy* clearly contemplates that a decision may be the product of more than one substantial factor; it refers to 'a substantial factor.'" *Bowen v. Watkins,* 669 F.2d 979, 984–85 (5th Cir.1982) (emphasis in *Bowen*). Beyond dispute, appellants have met the first half of their burden.

The law underlying whether appellants' activities were protected under the first and fourteenth amendments is more complex. We must weigh "the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *Pickering, supra,* 88 S.Ct. at 1734–35. The facts of each case will affect the balance uniquely; in this case we weigh the conduct of officers that goes beyond "pure speech," *Tinker v. Des Moines Independent School Dist.,* 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969) against the interest of the City of Columbus in seeing that its police services, a function traditionally accorded spe-

cial respect, remain effective, *see Waters, supra,* 684 F.2d at 839 (more deference accorded police in *Pickering* balance due to fact that safety of property and person at issue); *Wilson, supra,* 658 F.2d at 1027 (same).

We address initially the interests of appellants, and conclude that despite the fact that the activities of appellants involved conduct as well as "pure speech" their interest in expressing themselves was substantial. Three factors lead to this conclusion. First, the conduct here at issue was symbolic speech, closely "akin to pure speech," *Tinker, supra,* 393 U.S. at 508, 89 S.Ct. at 737. The conduct of the officers involved no violence or disorder: they peacefully removed the American flag from their uniforms. Representing as it does precepts fundamental to this nation, the American flag frequently has been the focal point of suits involving freedom of expression. *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Significantly, the officers in no way mutilated or defaced the flag; rather in their view they expressed their deep respect for it and the principles it represented. Removal of the patch under these circumstances bears great similarity to pure speech. Second, although we do not evaluate the content, or "social worth" of ideas, *Williams, supra,* 629 F.2d at 1003, certain types of speech traditionally are accorded greater protection in our society by virtue of the fact that the speech goes to the heart of our democratic process. *See Connick v. Myers,* —— U.S. ——, ——, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (speech on "public issues occupies the 'highest rung of the hierarchy of First Amendment values'"); *Pickering v. Board of Education, supra,* 88 S.Ct. at 1737 (debate on matters of public importance "core value" of the Free Speech Clause of the First Amendment); *Williams, supra,* 629 F.2d at 1003 (when matters vital to the public interest at

issue employee's right to speak must be protected "vigorously"); *Berdin v. Duggan,* 701 F.2d at 912 (*Pickering* balance includes question whether speech a matter of "public concern"). Appellants sought to emphasize a widely-held perception of racially discriminatory practices in the City of Columbus Police force. These practices concerned not only internal police matters, but matters of interest to the community-at-large as well. *See Connick, supra,* —— U.S. at ——, 103 S.Ct. at 1691 (First Amendment affords less protection to complaints concerning purely internal office affairs of public offices than it accords to matters of "public concern"). For example, appellants publicized a perception of discriminatory hiring of police officers, and a concern that beat assignments were being made along racial lines, i.e. black officers in black communities. For a police force to be effective it must have the respect and support of the community as well as its officers; our system of government demands that support be garnered through informed evaluation of circumstance, and not through the suppression of dissent. Third, and finally, courts repeatedly have held that a police officer does not receive a "watered-down version" of constitutionally protected rights by virtue of his public employment on the police force. *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967); *Waters, supra,* 684 F.2d at 836; *Wilson, supra,* 658 F.2d at 1027. In this context, appellants' interest in peaceful, effective expression of their views was great, and we accord it commensurate weight.

Balanced against the interest of appellants is the interest of the City and Police Department in promoting "the effectiveness of the force." We must go beyond asserting the need for "discipline" in "paramilitary" or "quasi-military" organizations, *Leonard v. City of Columbus,* No. 1514, mem. op. at 5–7 (M.D.Ga. Feb. 23, 1982); *see Williams, supra,* 629 F.2d at 1002, and identify the true interest the Department has in suppressing the speech and conduct that resulted in appellants' dismissal. That interest must derive from the reason appellants were dismissed.

Appellees' brief states "[n]one of the plaintiffs in this case were dismissed for speaking, nor were they dismissed for flag abuse; all of them were dismissed for *[d]efying properly constituted authority,*" .... Brief of Appellee at 38 (emphasis supplied). The district court elaborated upon the "properly constituted authority." "[Removing the flag] was a calculated show of contempt for the City authority and a demonstration of refusal to obey its lawful ordinances, rules and commands."

■ Simply stated, the officers were dismissed for failing to obey a resolution of the City of Columbus requiring the flag patch on police uniform. That the speech/conduct that led to dismissal is proscribed by statute is irrelevant to first amendment analysis, however, if that statute suppresses constitutionally protected activity. *See Williams, supra,* 629 F.2d at 1000 n. 13 and cases cited. In other words, there must be an interest apart from compliance with a statute; a statute which inhibits constitutional rights without sufficient governmental interest is invalid.

Although the district court restrained appellants from eliciting testimony concerning the purpose of the flag requirement itself, it was the obligation of appellees to develop that interest, and they did not seek to do so. Given the nature of the ordinance violated, however, we can deduce what the interest would be. The resolution required a flag patch on the sleeve of a police uniform, it did nothing more and nothing less. Testimony confirms the presence of the patch had no relation to the efficient performance of police duties. What the flag patch did accomplish is an integration of the police into the community, the flag patch representing a devotion to, and concern for, American ideals. Although this sort of goal is most admirable, it is specifically because of what the flag stands for that the interest in having the patch worn must bow to the greater interest of the dismissed officers' free speech.

We can discern yet another interest here, one intimately tied to appellants' status as

police officers. Although the City fails to advance this argument itself, we recognize an intrinsic interest in having police officers comply with ordinances of a properly constituted governing body. This interest is a valid and important one. It is not determinative in every instance, however, and certainly is insufficient here. Uncontroverted evidence at trial indicated that a number of police officers invariably were without the flag patch. Whether this was because "old" uniform shirts did not have the patch, and whether the officers wilfully or negligently failed to sew them on, is irrelevant: if the City's interest in police compliance with City ordinances was compelling, discipline should have followed every violation. It is likewise undisputed that appellants were the first officers ever disciplined for failing to wear the patch. It was not until after appellants were dismissed that a white officer was disciplined for failing to wear the flag; in contrast to the dismissals here, that officer was suspended for five days.

Witnesses for the City acknowledged the above facts, but sought to distinguish this case on the basis that appellants stood up in front of the media and removed the flag patch, announcing they could not wear it because of injustice on the force. Such testimony only serves to emphasize that appellants were not punished for failing or refusing to wear the flag,[5] they were punished for speaking. That the City may not do. *Mt. Healthy,* supra *Williams,* supra. Weighing the strong interest of appellants in speaking on a matter of public importance

against the interest of the City in having the flag worn on the uniform, an interest no City official showed concern for until these black officers took the patch off, we can only conclude the speech was protected.[6]

This brings us to the second step of analysis under *Mt. Healthy. Mt. Healthy* recognized that if the speech was protected no reason would justify disciplinary action on account of the speech. The *Mt. Healthy* Court therefore required that, once a plaintiff has met his burden, the burden shifts to the defendant to show, by a preponderance of the evidence, that the discipline would have occurred even in the absence of the protected conduct. Here, it was the obligation of the City of Columbus to show that dismissals would have occurred despite the flag incident. The City offered no evidence in this regard; indeed, it objected to plaintiff counsel's attempt to discern what role the flag incident played in the minds of Board members who affirmed the dismissal.[7] The Chief of Police testified he dismissed the officers for participating in the flag incident. Director Sargis compared the flag incident to the straw that broke the camel's back, the culmination of a "crescendo" of first amendment activity.

Appellees having failed entirely to address, let alone prove, their burden under *Mt. Healthy,* the judgment of the court below is reversed and the case is remanded for a determination of the appropriate remedy.

REVERSED.

5. Even if every officer who forgot or refused to wear the flag had been punished prior to these events, on the facts of this case it is doubtful that the conduct of appellants was properly subject to discipline. At the time of the flag incident appellants were off-duty; they would not be in violation of the City resolution until they appeared for duty without the flag. *See Hess v. Indiana,* 44 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (words advocating lawless activity in future not punishable unless they caused imminent lawless activity). Accordingly, discipline was meted out in this case prematurely.

6. Even assuming the interest of the state in having police officers comply with laws, that

interest is not an absolute one. Officers would be under no compunction to comply with a law unconstitutional on its face, for example one that required white officers to use one drinking fountain, and blacks another.

7. Although, in part upon motion of appellee, Judge Elliott cut off questioning about whether the policemen would have been dismissed for the flag incident alone as "pure speculation" Director Sargis responded to the question stating, "[i]f there had been nothing else I doubt seriously that I would have fired them." Given the other activities, however, the flag incident "motivated," indeed directly caused, the dismissals.