797 F.2d 953
 Stephen A. EILAND, Plaintiff-Appellant,
v.
The CITY OF MONTGOMERY, a municipal corporation; and Emory
Folmar, Individually and in his official capacity
as Mayor of the City of Montgomery,
Defendants-Appellees.
 No. 85-7295.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 26, 1986.
Rehearing and Rehearing En Banc Denied Oct. 6, 1986.
 
 Vanzetta Penn Durant, Montgomery, Ala., for plaintiff-appellant.
 N. Gunter Guy, Jr., Robert C. Black, Randall Morgan, Montgomery, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.
 MORGAN, Senior Circuit Judge:
 
 
 1
 Appellant Stephen A. Eiland appeals from an adverse jury verdict on the merits of his claim that he was unconstitutionally demoted from his position as police corporal in derogation of his first amendment right to free speech. The adverse employment action against Eiland arose from an incident occurring shortly before the City of Montgomery, Alabama mayoral election, when Eiland posted a humorous poem in three locations in the police station criticizing Mayor Emory Folmar and his police "bodyguards." The district court determined that to the extent the poem criticized Mayor Folmar, it was constitutionally protected speech, but to the extent that it criticized the police bodyguards, it was not constitutionally protected speech. The court similarly charged the jury that only the poem's references to the mayor were protected speech, while the poem's references to the aides were not protected. The court then submitted to the jury the limited question of whether Eiland's demotion stemmed from his constitutionally protected criticism of the mayor, to which the jury responded in the negative. The appellant now challenges the district court's determination to treat the poem as containing two subjects, one of which was not protected speech. We reverse and remand for further proceedings.
 
 I.
 
 2
 At the time of the incident in question, appellant Stephen Eiland was a corporal in the City of Montgomery, Alabama, police department. In September of 1983, Eiland filed a petition to intervene in a race discrimination suit pending in the Middle District of Alabama regarding employment practices of the police department. His petition alleged that promotions in the police department were based on political favoritism in violation of the First Amendment. Another officer subsequently joined the petition to intervene, with the matter receiving coverage in the local Montgomery press. Eiland's petition to intervene was denied, although his political favoritism claim subsequently was filed as another independent suit.
 
 
 3
 During this same time frame in the fall of 1983, Mayor Emory Folmar was running for re-election. The lower court found, and it is clear from the record, that the promotional practices of the police department under Folmar were an issue in the mayoral campaign.[1] Three days before the mayoral election, appellant Eiland typed a poem on a typewriter located in the police department and posted that poem in three locations within the building while entering duty later that day. Eiland actually authored only the last two lines of the poem, which read in its entirety as follows:
 
 EMORY "AMIN"IS OUR RULING GOD
 WE FLINCH WHEN HE BLINKS, WE
 JUMP WHEN HE NODS
 THE POLICE DEPARTMENT ADDS
 ZEST TO HIS DAY
 
 4
 MUCH TO OUR HAPPINESS??? NAY!
 
 TO OUR DISMAY
 HE SELECTS CERTAIN MEN TO
 ESCORT HIM AROUND
 THESE ARE THE TRUE DULLARDS, I
 THINK MUST HAVE FOUND
 FOR THEY CANNOT FUNCTION
 WITHOUT EMORY'S ADVICE
 
 5
 THEY ARE NO LONGER MEN,
 
 THEY'VE BEEN TRANSFORMED
 INTO MICE
 I THINK THE WORD "RAT" APPLIES
 IN SOME CASES
 ESPECIALLY FOR THOSE FOND OF
 WEARING TWO FACES
 SO, DOWN WITH THE DICTATORSHIP
 AND DOWN WITH EMORY
 AND LIKE THE SLOGAN SAYS, LET'S
 
 6
 MAKE HIM A MEMORYThe poem was posted on bulletin boards in the police department break room, the Criminal Investigative Division office, and in a public elevator. The poems were brought to the attention of supervisory personnel shortly thereafter and were removed within approximately one and one half hours.
 
 
 7
 Almost immediately an investigation was instigated to attempt to discover who was responsible for disbursement of the poems. Lieutenant R. Ward and Sergeant D. Shaner each testified to having spent between two and three hours investigating the matter. Approximately two weeks later, it was determined that Eiland was responsible for posting the poems. After being questioned as to his involvement, the appellant filed a short report at the request of his superiors outlining his responsibility. Shortly thereafter, he requested and received the opportunity to discuss the matter with Mayor Folmar. After that meeting, Eiland was reassigned from his position as corporal to police officer. This suit ensued.
 
 
 8
 The only claim tried below was the appellant's assertion that he suffered adverse employment action in retribution for the exercise of his first amendment rights in publicizing the poem in question. The only question submitted to the jury was whether the appellant was disciplined for engaging in constitutionally protected speech to the extent that the poem criticized the mayor. The jury returned a general verdict answering in the negative. The appellant filed this timely appeal.
 
 II.
 
 9
 In order to prevail on a first amendment claim, a plaintiff must first demonstrate that the speech causing his employment difficulties was both constitutionally protected and was a "substantial motivating factor" in the employment decision. If established, the burden then shifts to the defendant to demonstrate by a preponderance of the evidence that the adverse action would have transpired even in the absence of the protected speech. See Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). See also Berry v. Bailey, 726 F.2d 670 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985).
 
 
 10
 The Mt. Healthy equation was most recently refined by the Supreme Court in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Connick involved a situation where Myers, an employee of a state district attorney's office, became disgruntled with her impending transfer to another division of the office. Shortly after the transfer, she prepared and distributed a questionnaire to her fellow employees seeking their views on numerous topics, such as the office transfer policy and their opinions of their supervisors. Viewing Myers' actions as the cause of a "mini-insurrection" among her co-workers, Connick terminated her. The Connick court noted that the initial task was to determine whether Myers' speech involved a matter of public interest, for if it did not, surveying the propriety of her discharge under the First Amendment was inappropriate. Id. at 146, 103 S.Ct. at 1689, 75 L.Ed.2d at 719-20. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." Id. at 147-48, 103 S.Ct. at 1690, 75 L.Ed.2d at 720. The Court concluded that only one question on Myers' questionnaire concerned matters of public concern, its real thrust being Myers' personal disgruntlement over her transfer. Id. Nevertheless, the Court went on to examine whether her discharge was justified inasmuch as that one question touched a matter of public concern.
 
 
 11
 The Court then applied the balancing test set forth in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) to determine whether the employer's actions were justified.[2] In striking the balance in favor of Connick, the Court emphasized that efficient operation of the district attorney's office required close working relationships. Furthermore, the Court considered significant the manner, time and place in which the questionnaire was distributed, bolstering its conclusion by noting that Myers exercised her expression at the office. Id. 461 U.S. at 153, 103 S.Ct. at 1693, 75 L.Ed.2d at 724. Finally, the Court emphasized that this dispute arose out of Myers' individual grievance with Connick regarding her transfer, which strengthened Connick's contention that Myers was actually challenging his authority to run the office. In short, the result in Connick to a large degree appears to be grounded in the Court's conclusion that Myers' questionnaire involved matters of public concern in only a "most limited sense." Id. at 154, 103 S.Ct. at 1693-94, 75 L.Ed.2d at 724.
 
 III.
 
 12
 In the instant case, the lower court struck the Pickering balance in favor of the mayor. The court initially determined that the poem had two principal and distinct subjects. The first subject was "Mayor Folmar and his purported manner of running city government." The second subject was "the mayor's aides or bodyguards and the purported political favoritism that the mayor practiced in selecting them to serve as aides and then in further promoting them in the ranks of the police department." Working from this premise, the lower court determined that both subjects were matters of legitimate public concern.[3] In continuing on to apply the Pickering balancing test to each subject separately, the court focused upon the potential disruptive effect of each subject upon the operation of the police department. The court found that the references to the mayor and his conduct of city business had little potential for disruption, while the negative references to the mayor's aides and bodyguards had a "substantial potential for disharmony in the department." Consequently, the court determined that only the first subject--the mayor himself and his running of city government--was "constitutionally protected."[4]
 
 
 13
 Based upon our review of the record,[5] we are convinced that the district court started its analysis on the wrong foot by determining that the poem had two distinct and separable subjects. The lower court justified its decision to treat the poem as having two subjects as grounded in the Connick decision. In that case, the Supreme Court apparently examined each question of Myers' questionnaire to determine whether they touched upon matters of public concern. The Court found that all but one question concerned matters personal to Myers, but inasmuch as one question did concern a matter of public interest, the Court went on to decide whether the employer's action was justified. The Connick decision, however, did not apply the Pickering balancing test to each individual question contained in the questionnaire, but rather the Court appeared to weigh the first amendment interests of Myers in the questionnaire as a whole against the interests of Connick. We do not read Connick as requiring that each subject of the poem be individually weighed against Folmar's interests under Pickering.
 
 
 14
 Rather, it appears that in most instances speech of a public employee will have aspects or subjects that are worthy of paramount protection under the First Amendment, as well as aspects or subjects that are not worthy of such heightened protection. The task under Pickering is to balance those competing interests and to determine whether the employee's interests in the speech as a whole outweigh the public employer's interests.[6] The approach taken by the district court here shortcircuited that balancing process by avoiding the hard choices inherent in the Pickering equation. It is rather easy to conclude that speech criticizing the mayor with whom the speaker has little or no contact may not be suppressed, while related speech criticizing other officers associated with the mayor with whom the speaker might have some contact may be suppressed. The difficult choice is to recognize that the same speech may simultaneously do both, and to resolve all of those competing interests.
 
 
 15
 This is not to say, of course, that in the proper case speech cannot have two distinct subjects. To hold otherwise, as the appellee observes, would be to grant a license to a speaker to join two totally unrelated subjects in an effort to obtain the protective shield of the First Amendment as to the entirety of the speech. But the instant case is not such a case. The real problem here is that the district court's conclusion that the poem addressed two distinct subjects is simply not justifiable. Both purported subjects, even in the words of the district court, are directed at the mayor--the first involves the mayor and his general conduct of city business; the second involves the mayor and his conduct of the police department. As part of the latter subject, some criticism of members of the police department is inherent. Yet the thrust of the poem, both from its wording and from the context from whence it arose as being posted three days prior to the mayoral election, focuses upon criticism of the mayor.
 
 
 16
 This case boils down to the question of whether the appellant's interest in criticism of the mayor in the heat of a political campaign, in which the running of the police department is an issue, outweighs the appellee's interest in maintaining intradepartmental harmony where that criticism of the mayor necessarily carries some critical fallout on members of the police department who work with the mayor. The Pickering balancing test has been applied in this circuit to cases involving police officers both prior to, see, e.g., Waters v. Chaffin, 684 F.2d 833 (11th Cir.1982); Wilson v. Taylor, 658 F.2d 1021 (5th Cir.1981),[7] and subsequent to Connick. See, e.g., McMullen v. Carson, 754 F.2d 936 (11th Cir.1985); Berry v. Bailey, 726 F.2d 670 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985); Leonard v. City of Columbus, 705 F.2d 1299 (11th Cir.1983), cert. denied, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984). As we noted in Waters, although police officers need not suffer a "watered-down version" of their constitutional rights, "the state's interest in regulating its police force can be especially compelling." 684 F.2d at 836 (citations omitted).
 
 
 17
 The district court in our case, as required by Connick and these cases, focused part of its inquiry in this regard on the potential disruption within the police department stemming from the appellant's speech. Although an employer need not allow events to deteriorate to the point of actual disruption before taking action, the Court in Connick cautioned "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." 461 U.S. at 152, 103 S.Ct. at 1692-93, 75 L.Ed.2d at 723. Clearly matters directly affecting an electoral campaign go directly to the heart of the democratic electoral process, see Leonard, 705 F.2d at 1304, which requires that we give the utmost deference to the speech that is possible. By focusing on each "subject" of the poem individually, rather than the poem as a whole, the district court had a constricted picture of the relevant concerns--the court failed to account for the fact that the criticism of the department members was entirely relevant to and inextricably intertwined with comment on the political campaign.
 
 
 18
 Once this factor is recognized, we conclude that a higher showing of potential disruption was required than was shown here in order to conclude that the appellee's interests outweighed the appellant's interests in his constitutionally protected speech. The unequivocal testimony adduced at trial was that the poem had only two potentially disrupting consequences. The first was that it precipitated an investigation into who was responsible for it comprising a sum total of approximately four to six hours work by two officers. This work was of the sort the officers might otherwise undertake, [Rec. at 323], and we perceive this effect to be of minor consequence. The second consequence was the possibility that the speech was perceived as exhibiting a general disrespect for fellow officers. This concern is associated with the paramilitary nature of a police department and the need to preserve departmental respect and discipline. But the need for discipline as an abstract concern should not be allowed to overshadow individual interests in free speech unless the department's "true interest" in suppressing the speech in this regard can be isolated and verified. See Leonard, 705 F.2d at 1305. See also Williams v. Board of Regents, 629 F.2d 993, 1002-03 (5th Cir.1980), cert. denied, 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981).
 
 
 19
 Based upon the record adduced below, we view the potential for disruption of discipline from the poem to be much less than the appellee contends. Although some witnesses expressed concern over the need for discipline and respect within the department, that testimony was almost uniformly based upon assumption and speculation as to how the poem might have been perceived by other officers. Significantly, most of this testimony came from former aides, who obviously would not have the most objective of perceptions of the poem.[8] Even those former aides, however, could not point to any specific effect on the feelings or relationships between any other officers and the aides, other than their own feelings toward Eiland. We find it more probative to this issue that two officers who were not former aides testified that they had no knowledge of adverse effects or disruption flowing from the poem. These officers indicated that the poem was primarily viewed as humorous political expression aimed at the mayor that was not taken at face value and that did not affect how the aides were perceived.[9] Under these facts, it appears that the department's concern over effects from the poem on discipline and respect was more abstract than real.
 
 
 20
 Finally, in regard to potential disruption, the humorous aspect of the poem cannot be ignored. The district court found and the appellee urges that "strong, vituperative humor may also be potentially disruptive." While this is true, we think it simply ignores reality to not recognize that the humorous satire, as opposed to a direct attack posed in all seriousness, can lessen the confrontational aspect of a speaker's comments. This is especially true here since some of the most biting criticism utilized in the poem was merely a parody of the mayor's own words reported in the local news press earlier in the campaign.[10] The fact that the matter was said in jest, and was perceived by many as such, surely is relevant to the determination of how potentially disrupting or demoralizing it may have been.[11]
 
 
 21
 Weighing all of the factors present in this case, we conclude that the appellant's interests in speaking here outweighed the appellee's interests in suppressing that speech. On one hand, it is true that the appellant exercised his views in the workplace. Nevertheless, it only took minutes from his on-duty time to distribute the poem, and it was prepared before he went on duty. There was no actual disruption of either the appellants' own job performance or the general operation of the department, and we view the potential for disruption from the poem to be within acceptable limits, in light of the context in which the speech arose. In sum, the determinative factor in this case is that the main thrust of this poem was criticism of the mayor in the heat of a political campaign.
 
 
 22
 We emphasize this holding is a narrow one. We recognize and give appropriate weight to previous authority setting forth the need of police departments to secure discipline and efficiency as a quasi-military entity. But the speech here clearly involved an issue of intense public interest, and although there was some fallout on members of the police department, the brunt of that criticism was directed at and perceived as aimed at the mayor. Had the comments expressed by the appellant not occurred in the context of the mayoral election campaign, nor had they been relevant to an issue of public concern in that campaign, our result no doubt would be different. Nevertheless, we conclude that the appellant's interest in expressing his views of the imminent political campaign via the poem in question outweighed the appellee's interests in suppressing that speech.
 
 IV.
 
 23
 As we noted earlier, a plaintiff bears the initial burden of demonstrating that his speech was protected and that it was a substantial motivating factor in his discipline. Once shown, the task under Mt. Healthy is then to determine whether the employer would have taken the same action notwithstanding the protected speech. Ordinarily, this residual question is a factual question that the sole reason for Eiland's reassignment was his posting of the poem. The mayor, as well, clearly admitted as much, and appellee's counsel flatly admitted that "the undisputed evidence is the mayor says I reassigned him because of his reference to those other people." [Rec. at 702]. Having concluded that the poem was protected speech in its entirety and that all of the evidence adduced below was uncontradicted in indicating that the poem was the cause of Eiland's reassignment, we see no reason for retrial of this matter as to the second prong of the Mt. Healthy inquiry. The appellant's reassignment was constitutionally impermissible. Therefore, we remand only for determination of the appropriate remedy.[12]
 
 
 24
 REVERSED and REMANDED.
 
 
 
 [1]
 In addition to the interest sparked by the activities of the appellant and his fellow officer, during this same time period the local Fraternal Order of Police unit voted to have the promotional practices of the police department investigated by persons from its national office. [Rec. at 369; 650-51]. As many witnesses testified, the promotional practices of the police department were matters of common conversation and interest
 
 
 [2]
 In Pickering, the Court stated: "The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568, 88 S.Ct. at 1734-35, 20 L.Ed.2d at 817. Pickering involved a case where a teacher was dismissed after sending a letter to a local newspaper that was critical of the way in which the school system officials had handled past revenue programs. Although finding that the teacher's speech was protected thus insulating him from dismissal, the Court emphasized that it was impossible to lay down a steadfast rule against which the first amendment rights of all public employees may be judged due to the vast variety of factual scenarios in which those statements will arise. Rather, the Court indicated that the previously mentioned balance must be struck under the particular facts of any given case. Id. at 568-570, 88 S.Ct. at 1734-1735, 20 L.Ed.2d at 817-18. The factors considered by the court included whether the statements impeded the ability of the speaker's superiors to maintain discipline or harmony among co-workers; whether personal loyalty and confidence were necessary to the proper functioning of the working relationship; and the extent and degree to which the speech touched matters of legitimate public concern. The Pickering court concluded that the case before it involved "a teacher [who] has made erroneous public statements upon issues then currently the subject of public attention, which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." Id. at 572-73, 88 S.Ct. at 1736-37, 20 L.Ed.2d at 819-20. Under such circumstances, the Court determined that the teacher's interest in free expression outweighed the school system's interest in limiting that speech
 
 
 [3]
 The appellee's brief does not appear to challenge this finding, which appears to be beyond dispute based upon this record. Inasmuch as the substantial motivating factor component of the Mt. Healthy equation was also beyond dispute, see infra text accompanying note 12, we proceed directly to the Pickering balancing test. See Ferrara v. Mills, 781 F.2d 1508, 1512-14 (11th Cir.1986)
 
 
 [4]
 The district court incorrectly concluded that the outcome of the Pickering balancing test determines whether speech is constitutionally protected. As we explained in Ferrara v. Mills, 781 F.2d 1508, 1513-14 (11th Cir.1986):
 The question of whether the employee's speech is constitutionally protected is a different issue from the ultimate question of whether the employer has violated the employee's right to freedom of speech. ... The Pickering balance is not triggered unless it is first determined that the employee's speech is constitutionally protected. If the employee's speech does not relate to matters of public concern, then the employee has no first amendment interest against which the employer's interest need be weighed.
 The first inquiry under Connick, therefore, is to determine whether speech touches matters of public concern and is constitutionally protected solely by consideration of "the content, form, and context of a given statement, as revealed by the whole record." Id., quoting Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690, 75 L.Ed.2d at 720. If speech is constitutionally protected under that test, then the court's task is to weigh the employer's interest in the efficient operation of the public office against the employee's interest in the constitutionally protected speech utilizing the Pickering equation. 781 F.2d at 1514. Although the district court applied Connick and Pickering in this sequence to each subject of the poem, the court was technically in error in concluding that the outcome of the Pickering test determined whether the speech was "constitutionally protected." The outcome of the Connick public interest test determines whether speech is constitutionally protected; the outcome of the Pickering balancing test determines whether the public employer's interests override the employee's interests in that constitutionally protected speech.
 
 
 [5]
 The question whether particular speech is constitutionally protected is one of law for the court. Consequently, we are obliged to survey the record in order to make our own "independent constitutional judgment on the facts of the case" in determining whether that speech is worthy of first amendment protection. See Connick, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10, 75 L.Ed.2d at 722, n. 10 quoting, Jacobellis v. Ohio, 378 U.S. 184, 190, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964) (Brennan, J.). See also McMullen v. Carson, 754 F.2d 936, 938 (11th Cir.1985) (in reviewing factual findings in First Amendment cases, court uses an independent examination of the record and is not bound by the clearly erroneous standard)
 
 
 [6]
 We draw further support in this regard from Berry v. Bailey, 726 F.2d 670 (11th Cir.1984). Berry involved a situation where a police officer was fired allegedly in retaliation for his speech in relation to an incident involving political supporters of the sheriff. The speech in question involved five different instances of statements made by the officer to various persons. The court observed that four of the statements in question involved the officer's failure to follow the orders of his superior, the sheriff. Those statements clearly were not protected under Pickering. The last statement involved critical remarks concerning a supporter of the sheriff. The court determined that "even if that remark might be constitutionally protected according to the Pickering test in other circumstances, in this context it was a part of a set of actions posing a threat to the disciplinary structure of [the police officer's] job," resulting in his expression not being insulated. Id. at 676. The court in Berry applied the Pickering balance to the police officer's speech as a whole, rather than to each component part
 
 
 [7]
 As a decision of a Unit B panel of the former Fifth Circuit rendered after October 1, 1981, this decision is binding precedent in this circuit. Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982)
 
 
 [8]
 Along these same lines, we cannot help but observe that we found much of the aides' testimony to be simply incredible. For example, more than one testified that they construed the closing line in the poem, "Let's make Emory a memory," as possibly being a veiled assassination threat. We think it is simply impossible under any reasonable construction of the poem to reach such an absurd conclusion, and such assertions do little to bolster these witnesses' testimony
 
 
 [9]
 See Rec. at 641; 644; 668-69; 673-74. In addition, Lt. David Green, who also apparently was not a former bodyguard, testified that he was unaware of any disruption. Rec. at 646
 
 
 [10]
 The reference to "dullards" in the poem stems from the mayor's response to charges of promotional favoritism published in the local media. The mayor was quoted as stating: "I try to select the best and the brightest. Obviously, I'm not going to select a dullard to be my aide." Plaintiff's Exhibit # 2. Furthermore, testimony at trial indicated "Let's make Emory a memory" was a campaign slogan seen on bumper stickers in Montgomery, and that "Emory Amin" was also a term sometimes used in description of the mayor
 
 
 [11]
 There was even testimony at trial that humor such as this was common and that it often was a means of releasing tension in the police department. As one witness testified, "If all I ever get called is a rat, I'm in good shape." Rec. at 672-73; 678
 
 
 [12]
 Compare Leonard, 705 F.2d at 1306 (reversing lower court's determination that speech was not protected; inasmuch as appellees had failed to even address whether appellant would have been discharged notwithstanding that speech, remanded solely for determination of remedy; bench trial); Waters, 684 F.2d at 840 (where the court on appeal found statements protected and they were the only asserted basis for discipline, the court remanded for determination of remedy; also bench trial)