998 F.2d 925
 Jackie M. BELYEU, Plaintiff-Appellant,
v.
COOSA COUNTY BOARD OF EDUCATION; Larry K. Hardman,
individually and in his official capacity as Superintendent
of Education; Robert S. Smith; Claude Bain Culver; Louis
B. Childs; James C. Newberry and Charles F. Ward,
individually and in their official capacities as members of
the Coosa County Board of Education, Defendants-Appellees.
 No. 92-6229.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 25, 1993.
 
 Theron Stokes, Alabama Educ. Ass'n, Kenneth L. Thomas, Cynthia W. Clinton, Thomas, Means & Gillis, Montgomery, AL, Michael D. Simpson, Nat. Educ. Ass'n, Washington, DC, for plaintiff-appellant.
 Frank S. Teel, Teel & Teel, Rockford, AL, for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before BIRCH, Circuit Judge, CLARK, Senior Circuit Judge, and HOEVELER*, Senior District Judge.
 BIRCH, Circuit Judge:
 
 
 1
 In Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court formulated a balancing test to resolve conflicts between the interest of a public employee in free speech and that of a government employer in regulating the conduct of its employees. In this case, we are required to apply Pickering to determine whether a public school system violated the first amendment rights of a teacher's aide by declining to rehire her because of her speech at a public meeting. Concluding that the school system could not base its employment action upon its employee's speech, we REVERSE the decision of the district court and REMAND for further proceedings.I. BACKGROUND
 
 
 2
 Jackie M. Belyeu, a black woman, was employed by the Coosa County School System ("School System") as a special education teacher's aide from 1988-1990. During this period Belyeu was involved in several disputes with School System personnel. In November 1989, contending that her child's English teacher awarded grades based on a student's race, Belyeu engaged in several emotional conferences with the teacher and Roy Green, her daughter's principal. She ultimately complained to Larry Hardman, the system superintendent. Belyeu complained to Hardman that she should be paid as a bus driver for the time she spent transporting special education students in her personal vehicle. Belyeu was also involved in a protracted dispute concerning overtime work. An investigation by the Department of Labor determined that eight School System employees, including Belyeu, had not been compensated for work beyond their regular 40 hour week. The school board opted to remunerate these employees with compensatory time credit. Belyeu instead insisted on receiving backpay, and Hardman eventually decided to settle the dispute by accepting her demand.
 
 
 3
 At a February 1990 meeting of the Coosa County Central High School Parent-Teacher Association, Belyeu questioned David Touart, the principal of Central High School, about the school's failure to have some program or other commemoration for Black History Month. At the time, Belyeu's daughter attended Central High School and Belyeu was employed as a teacher's aide at an elementary school in the same system. Belyeu expressed her concern that all students, black and white, should be informed of the contributions of black Americans to the development of the United States and of the State of Alabama. While the high school provided two buses to take interested students to a program at an area community college, Belyeu explained that due to limited space on the buses, only juniors and seniors were allowed to attend. Further, she felt that the optional nature of the program was inappropriate because white students should be compelled to learn about black historical figures just as black students are required to learn about white historical figures. Touart apologized for not recognizing these concerns earlier. Both Touart and Belyeu were polite at the meeting. Belyeu secretly tape recorded her remarks.
 
 
 4
 Immediately after the meeting, Touart asked Belyeu to speak privately in his office. He told her that he was disappointed that she felt that she had to raise this issue in a public forum and that he would prefer that she discussed such matters privately with him. He expressed his concern that debating the matter publicly could exacerbate racial tensions.
 
 
 5
 At the end of each school year, all teacher's aides are expected to tender their resignations because funding for these positions varies from year to year. At the conclusion of the 1989-1990 school year, Belyeu offered her resignation, but sought re-employment as a teacher's aide for the following year. With the exception of Belyeu, every teacher's aide who sought re-employment with the School System was hired for the 1990-1991 school year. In addition, the School System employed eight or nine new teacher's aides.
 
 
 6
 Belyeu filed an action against the Coosa County Board of Education, the members of the board in their official and individual capacities, and superintendent Hardman, alleging that, in violation of 42 U.S.C. § 1983 and 42 U.S.C. § 2000e, et seq. (Title VII), the School System refused to rehire her because of her speech at the February PTA meeting and based on her gender. After a nonjury trial, the district court rendered final judgment in favor of the School System on both claims.[1] With regard to Belyeu's first amendment claim, the court concluded that her speech at the PTA meeting addressed a matter of public concern and that the decision not to rehire Belyeu was based in part on her speech. Applying the balancing test prescribed by Pickering, however, the court held that the School System's interest in reducing racial tension outweighed Belyeu's first amendment rights. Concluding that the School System properly could have declined to rehire Belyeu based on her speech, the court did not reach the issue of whether the School System would have otherwise made the same employment decision. Belyeu appeals.
 
 II. DISCUSSION
 
 7
 A public employee's right to speak is limited by the government's interest in preserving the efficiency of the public services that it performs through its employees. In order to determine whether the government has violated the first amendment by basing an employment decision on the speech of its employees, we apply the Pickering balancing test. First, the court must determine whether the expression addressed a matter of public concern. Martinez v. City of Opa-Locka, 971 F.2d 708, 712 (11th Cir.1992) (per curiam); Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir.1989). Second, the court must consider whether the employee's first amendment interest outweighs the interest of the government, as an employer, in the efficiency of public services. Id. If the public employee prevails on the balancing test, the district court must determine whether the employee's speech played a "substantial part" in the government's decision to demote or discharge her. Id. If the public employee prevails on these issues, the government has the opportunity to show by a preponderance of the evidence that it would have reached the same employment decision in the absence of the protected conduct. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).
 
 
 8
 The district court considered Belyeu's speech concerning her compensation and her child's English grade to address matters of private interest, but held that her speech at the PTA meeting implicated public concerns. Neither party contests this disposition. Belyeu directed her PTA speech to the emphasis that a newly integrated public school should place on the historical contributions of black Americans. Reviewing the district court's holding de novo,[2] we agree that Belyeu spoke to a matter of public concern at the PTA meeting. The district court also concluded that Belyeu's speech affected the School System's decision not to rehire her.[3]
 
 
 9
 Applying the Pickering balancing test, the court concluded that the School System's interest in avoiding racially divisive public criticism outweighed Belyeu's interests in free speech. The court found that Belyeu's speech at the PTA meeting "had the potential to undermine the delicately balanced racial[ ] atmosphere that existed at Central High." R1-35-32. Moreover, the court noted that Belyeu chose "to raise publicly a potentially divisive issue ... rather than first seeking a satisfactory resolution privately. Expecting Belyeu to first address privately with the principal her concerns about the lack of a Black History Month program at Central is not unreasonable or burdensome." Id. at 31.
 
 
 10
 We must consider several factors in balancing the State's interest in efficient provision of public services against [an employee's] speech interest, including: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made.
 
 
 11
 Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir.1988), cert. denied, 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 187 (1989). With regard to the School System's interest in reducing racial animosity, the evidence does not show any tangible impact of Belyeu's speech. At most, the issue was discussed after the meeting by School System personnel and in the community and Belyeu felt "shunned" by the white administrators at her school on the day after the PTA meeting. R2-27. There is no evidence that racial harmony at Central High School was affected by Belyeu's remarks or that the School System's function was disrupted in any fashion. Further, the substance of Belyeu's speech permits only weak speculation that her remarks had such a potential.[4] Belyeu advocated, in a noninflammatory manner, the future commemoration of Black History Month. She did not allege that the failure to celebrate Black History Month stemmed from the personal prejudice of School System personnel, nor did she advocate any direct action by members of the black community. In short, without animosity or unnecessary confrontation, her speech sought a solution within the School System to a problem of public concern.
 
 
 12
 The other factors set out in Morales, the manner, time, place and context of the speech, also favor Belyeu. 848 F.2d at 1149. She spoke, during the period for questions, as the parent of a child attending Central High School at a public meeting held for the purpose of discussing issues of concern to teachers, administrators and parents. Belyeu, like any citizen, has a strong interest in expressing her thoughts on an issue of public concern free from government sanction. See Waters v. Chaffin, 684 F.2d 833, 837 (11th Cir.1982). Moreover, society possesses a compelling interest in the unrestrained discussion of racial problems. For example, in Leonard v. City of Columbus, 705 F.2d 1299, 1304-05 (11th Cir.1983), cert. denied, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984), we held that the speech of state employees regarding racially discriminatory practices in the police force addressed a matter of interest, not only in the internal administration of the police force, but to the community. In Connick v. Myers, 461 U.S. 138, 148 n. 8, 103 S.Ct. 1684, 1691 n. 8, 75 L.Ed.2d 708 (1983), the Supreme Court characterized racial discrimination as "a matter inherently of public concern." Similarly, the curriculum of a public school, like the allocation of public school funds at issue in Pickering, is a topic worthy of public debate. 391 U.S. at 571-72, 88 S.Ct. at 1736.
 
 
 13
 We determine de novo whether the district court correctly weighed the competing interests of a public employee and her government employer. Connick, 461 U.S. at 150 n. 10, 103 S.Ct. 1692 n. 10; Martinez, 971 F.2d at 712. After balancing the School System's interest in quelling public discussion of racially divisive issues against Belyeu's interest in free speech, we conclude that, under Pickering, the latter is more compelling. Belyeu's remarks did not disrupt the School System's function by enhancing racial division, nor, based on the nature or context of her remarks, was her speech likely to do so. See Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1506 (11th Cir.1990) (resolving Pickering balance in favor of school employee who spoke in nondisruptive fashion at employee meeting where the school could not show any interruption of school functions).[5] We have upheld the right of public employees to discuss the alleged racial discrimination of their employer under circumstances more likely to result in the disruption of public services. For example, in Leonard, black police officers participated in a public demonstration, picketing the department and removing the American flags from their uniforms in protest of the police brutality to members of the black community as well as discrimination within the department against black officers. 705 F.2d at 1300-01. This is not a case where the weight of the evidence foretells an imminent conflict as a result of the employee's speech. Cf. McMullen v. Carson, 754 F.2d 936, 939 (11th Cir.1985) (upholding termination of deputy who was a known Ku Klux Klan recruiter where uncontradicted evidence showed that the black community would categorically distrust the department and that interdepartment conflict with employee's black co-workers was imminent). This is also not a case where the employee occupies a sensitive position representing the employer in its dealings with the community. Belyeu served no confidential, policy-making or public contact role. Cf. Sims v. Metropolitan Dade County, 972 F.2d 1230, 1237-38 (11th Cir.1992) (individual defendants enjoyed qualified immunity for terminating plaintiff as liaison between black and Hispanic communities based on plaintiff's racially inflammatory remarks). In sum, the evidence fails to show that Belyeu's speech was a significant threat to any interest of the School System.
 
 
 14
 In concluding that the Pickering balance did not favor Belyeu's speech, the district court held that the School System could require Belyeu to present her thoughts on Black History Month privately, and not at a public meeting. The uncontradicted testimony shows that there was no formal policy or general requirement that concerns of this nature be submitted privately to the School System prior to public discussion. Belyeu was never informed that, by speaking at the PTA meeting, she was in violation of any rule or policy. This issue, therefore, merely restates the matter of whether, under Pickering, the School System's interest in prohibiting public discussion of Black History Month outweighs Belyeu's interest in free speech. As set out above, the evidence does not show that the public nature of Belyeu's speech jeopardized any legitimate interest of the School System to the extent necessary to outweigh Belyeu's first amendment interest. Further, we note that government employers relying on policies forbidding open discussion of matters of public concern have fared poorly under the Pickering analysis. See, e.g., Moore v. City of Kilgore, 877 F.2d 364, 369-76 (5th Cir.) (fire department impermissibly applied rule forbidding unauthorized discussion of department policy to discipline employee's speech), cert. denied, 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989); Luethje, 872 F.2d at 354-56 (rule prohibiting discussion of school problems with anyone other than principal unconstitutional); Anderson v. Central Point School Dist., 746 F.2d 505, 507 (9th Cir.1984) (per curiam) (upholding injunction against policy forbidding direct communication by teachers to school board); Czurlanis v. Albanese, 721 F.2d 98, 105-06 (3d Cir.1983) (county employee improperly disciplined for speaking directly to elected board). The district court's conclusion that a school system can require an employee to consult privately with her employer regarding issues of public concern ignores the substantial interest both of the employee and the community in the open and unrestricted debate of public matters. The free speech clause is "intended to remove governmental restraints from the arena of public discussion." Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). It is a guarantee to individuals of their personal right "to make their thoughts public and put them before the community." Curtis Publishing Co. v. Butts, 388 U.S. 130, 149, 87 S.Ct. 1975, 1988, 18 L.Ed.2d 1094 (1967). Where the public statements of a teacher "are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally.... the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." Pickering, 391 U.S. at 572-73, 88 S.Ct. at 1737. The district court therefore erred by concluding that, under these facts, Belyeu could be required to submit her complaints to the School System in private.
 
 III. CONCLUSION
 
 15
 The district court correctly concluded that Belyeu's PTA speech addressed a subject of public concern. After de novo review, however, we conclude that the court erred in determining that the School System's interest in confining public discussion of racially divisive issues outweighs Belyeu's interest in free speech. We therefore REVERSE and REMAND for proceedings consistent with this opinion.
 
 
 
 *
 Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Belyeu has not appealed the judgment on her Title VII, gender claim
 
 
 [2]
 Bryson, 888 F.2d at 1566 & n. 2
 
 
 [3]
 The district court in its order, stated:
 Based on the evidence presented at trial, it is evident to the court that Belyeu's speech on these issues, in addition to her request for a change in her agreed upon compensation for transporting students, affected defendants' decision not to reemploy her.
 R1-35-24. We are uncertain if this statement was meant to resolve whether Belyeu's speech was a substantial or motivating factor in the decision to not rehire her. On remand, the district court should explicitly address this issue.
 
 
 [4]
 Touart testified that he felt that there was "a possibility that [Belyeu's public comments] could alienate black against white." R3-22. Similarly, he later stated that "possibly a meeting like [the February PTA meeting] would cause blacks to be alienated against whites and whites against blacks." R3-25
 
 
 [5]
 Accord Luethje v. Peavine School Dist., 872 F.2d 352, 355 (10th Cir.1989) (Pickering balance favored school employee where, although the employee's complaints created a community controversy, there was no evidence that her speech impaired discipline or the effective operation of the school); Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1081 (4th Cir.1987) (assertion that speech by teacher at public meeting might result in turmoil insufficient to justify termination under Pickering), cert. denied, 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988); Eiland v. City of Montgomery, 797 F.2d 953, 959 (11th Cir.1986) (unsupported speculation that derogatory poem posted by police officer may have disruption discipline does not outweigh employee's right to speech), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987)