**Sandra N. TAYLOR, Plaintiff,**

v.

**BARTOW COUNTY, GEORGIA, and Naomi Tish Johnson, individually and in her official capacity as Clerk, Bartow County Superior Court, Defendants.**

**Civ. A. No. 4:93–cv–135–HLM.**

United States District Court,
N.D. Georgia,
Rome Division.

June 6, 1994.

Debra E. Schwartz, Marcia Weil Borowski, Stanford Fagan & Giolito, Atlanta, GA, for plaintiff.

George Carey Nelson, III, Jenkins & Eells, Cartersville, GA, Kirk Randall Fjelstul, Jenkins & Eells, Atlanta, GA, for defendants.

### ORDER

HAROLD L. MURPHY, District Judge.

This action for violation of First Amendment rights is again before the Court on Plaintiff's and Defendants' motions for summary judgment after certain issues were briefed by the parties. The Court will vacate its prior order in this case and enter this order, denying Plaintiff's Motion for Summary Judgment and granting Defendants' Motion for Summary Judgment.

The Court vacates its previous order and enters the present order most especially to address Plaintiff's concerns about the Court's statement of Factual Background in the previous order. The Court expands the statement of factual background to address Plaintiff's concerns. The Court expands the Statement of Summary Judgment Standards, adding material regarding specific facts versus conclusory allegations. The Court sets forth its previous discussion of procedural and substantive due process. The Court restates and expands the discussion of *Terry v. Cook* and why this case does not involve raw political patronage. Finally the Court addresses the *Pickering* test and qualified immunity.

### *FACTUAL BACKGROUND*

Plaintiff began working for the Bartow County Clerk of Superior Court in 1978, and was appointed a deputy clerk in the early 1980's. She left in 1985 to attend college, but after four months returned in a part-time capacity. In 1989 Defendant Johnson's predecessor, Grady Jefferson, again appointed Plaintiff as a deputy clerk.

Defendant Johnson served as chief deputy clerk from approximately 1980 until her election as Clerk of Superior Court in 1992.

Plaintiff did not agree with certain actions taken by Mr. Jefferson and criticized his management style. In 1991 and early 1992 Plaintiff and other deputy clerks criticized Mr. Jefferson for being indecisive and unwilling to support his employees. In 1991, Plaintiff encouraged Mr. Steve Bradley to run against Mr. Jefferson the next year. In early 1992 Mr. Jefferson decided not to seek re-election; Plaintiff, however, did not encourage Mr. Bradley to run at that time or thereafter.

Mr. Steve Stewart announced his candidacy first, and Plaintiff expressed her support for him. It is disputed whether or not Plaintiff encouraged Defendant Johnson to run, or expressed support for her. Plaintiff does not remember such an expression and feels she would remember it had it occurred. Defendant thinks Plaintiff did express support for her at one time.

During the primary campaign Plaintiff actively campaigned for Mr. Stewart, including door-to-door solicitation, campaign literature distribution at a street fair, and a monetary contribution. Plaintiff used accumulated va-

cation time and sick leave to perform these activities. Plaintiff, however, while at work, also solicited votes for Mr. Stewart from employees and persons coming into the courthouse for business.[1] At work, Plaintiff told co-workers that if Defendant were elected that it would be no improvement over Mr. Jefferson, whom Plaintiff described as wishy-washy, disorganized and lacking in leadership. Plaintiff, however, stopped short of saying that Defendant was incapable of doing a good job. Plaintiff never said anything negative or divisive directly to Defendant. Plaintiff also wrongly told people that another clerk, Sherry Graves, supported Mr. Stewart in order to gain support for Mr. Stewart.

During the campaign Mr. Stewart would come to the Clerk's office first thing in the morning, and Plaintiff would "[tell] him about some things" regarding the office. Also, Mr. Stewart and Plaintiff discussed "running as a team" wherein Plaintiff would become Chief Deputy. They decided against that strategy, but Mr. Stewart would have appointed Plaintiff as his Chief Deputy had he been elected. Plaintiff, however, testified that she did not think the appointment was definite.

Plaintiff stated to at least one person that she would not work for Defendant if Defendant were elected.[2] Plaintiff told other employees and members of the public that Defendant would be no change from Mr. Jefferson and that Defendant had not demonstrated leadership.

Upon learning of Defendant's candidacy, Plaintiff explained to her that she could not support Defendant and expressed the hope that Plaintiff's position did not hurt Defendant's feelings. Defendant responded "[w]ell, I guess it does hurt my feelings and possibly hurt our friendship." After Defendant won the run-off, Plaintiff congratulated her and expressed the hope that they could get along. Defendant told Plaintiff that she "was not going to hold any grudges."

In a campaign radio debate, Defendant stated that she would retain the then current staff of the Clerk's office, which included Plaintiff. Defendant also told Plaintiff's husband that she intended to retain Plaintiff. However, there were rumors "around the courthouse" that Plaintiff would not be retained. Sometime in late 1992 Defendant sought advice from the Bartow County personnel director on how to terminate Plaintiff. Defendant hired two new employees prior to December 31, 1992 and told them to report on January 4, 1993. These employees, however, did not become deputy clerks.

While it cannot be determined which candidate all the other deputy clerks supported, Defendant felt that at least two, and possibly others, did not support her. Defendant discovered after the election that one, Terri Jones, actively supported Mr. Bradley.[3] In fact, Sherry Graves, Jeanette McCollum, Melba Scoggins, Ruth Ross, Terri Jones, Bobbie Dover, and Carla Jefferson all supported Defendant's opponents. After the election, all the deputy clerks, except Plaintiff, approached Defendant and asked to

---

1. Plaintiff somewhat disingenuously characterizes this as "not actively campaign[ing] at work, ..., although it is possible she may have asked people at work to support Stewart." Black's Law Dictionary defines campaign as "[a]ll the things and necessary legal and factual acts done by a candidate *and his adherents* to obtain a majority or plurality of the votes to be cast." *Black's Law Dictionary* 258 (4th ed. 1968) (emphasis supplied).

2. In the previous order, the Court stated that Plaintiff also said she would hate to work for Defendant. In deposition she could not remember. After Defendants submitted affidavits of others that Plaintiff did make such a statement, Plaintiff submitted an affidavit denying saying that she would hate to work for Plaintiff. The record is undisputed, however, that Plaintiff said that she would not work for Defendant.

3. Plaintiff argues that Defendant did not *know* if others actively and openly campaigned for opponents. For purposes of this case it is immaterial whether Defendant "knew" or "felt" that others opposed her. *See Connick v. Myers*, 461 U.S. 138, 141, 103 S.Ct. 1684, 1686–87, 75 L.Ed.2d 708 (1983) (employee in part fired because employer "felt" employee's comments would be damaging if discovered by the press); *McCabe v. Sharrett*, 12 F.3d 1558, 1572 (11th Cir.1994) (sheriff fired secretary because he "felt" her relationship with deputy would undermine his office). The Court notes that it would be no defense to a political patronage claim for a defendant to argue that he only felt, but did not know, that those he fired opposed him.

work in the new administration and expressed a willingness to be cooperative. Defendant reappointed all employees, including those she felt opposed her in the campaign, except Plaintiff.

Plaintiff, in conclusory terms, asserts that her relationship with her fellow employees did not become strained or difficult, that she was not withdrawn or hostile, and that she satisfactorily performed her duties. Plaintiff stated that she was not aware of the other clerks' discomfort and that she herself did not feel uncomfortable. However, the undisputed "specific facts" are that the other clerks' were uncomfortable.

Carol Payne, who was appointed chief deputy clerk after the election, stated that Plaintiff "would walk around the office to avoid coming by my desk when leaving the office." Moreover, Ms. Payne states, and others agree that "it was difficult to even speak with Sandra Taylor, and she would leave the office without completing her work. She would hardly talk with anyone nor did she have anything to do with most of the staff in the office. For example, during Mr. Jefferson's retirement party, she would not stand with the office but stood across the room from us." Another deputy clerk, Ms. Deborah Southern, stated "the staff was afraid to speak to her because we never knew how she would react. I sensed animosity toward Carol Payne, the chief deputy. [Plaintiff] would come to my office to help me instead of staying in her office knowing others were backlogged." Ms. Graves stated that after "Steve Stewart was defeated in the primary, [Plaintiff] withdrew from communicating with the other deputy clerks. She would not talk to anyone in the office. As a result, the other deputy clerks and I could not communicate with [Plaintiff] and ask her to complete her responsibilities as part of the team." Deputy clerk, Terri Jones, averred that "[Plaintiff] would not have much to say to most of the other deputy clerks."

Ms. Graves stated "[p]art of the responsibility of each deputy, including [Plaintiff], is to help the other deputies when a backlog occurs, or fill in when a deputy has another assignment. Rather than help, [Plaintiff] would go to court or leave." Terri Jones averred "[Plaintiff] became difficult to work with in the office. She would help some people but not others. She became withdrawn and exhibited a poor attitude when it came to working with the other deputy clerks. She would not communicate and would not help to make sure that the work was all complete. For example, when there were people absent and it was [Plaintiff's] and my job to fill in for these people, many times [Plaintiff] would go to the Courtroom instead of helping in the office. Sometimes this worked a hardship on me, especially if I had to close out reports which had deadlines. Also I had to make arrangements to work longer hours than I usually worked. It appeared to me that [Plaintiff] was leaving the office or going to court when other work needed to be done."

Both during the campaign when Plaintiff was taking vacation and sick time, and after the election her responsibility of filing the U.C.C.s became backlogged.

Plaintiff in response to summary judgment submitted the affidavit of former Clerk Mr. Jefferson. Mr. Jefferson stated that "for the entire time of her employment with me, [Plaintiff] performed her job well. She always followed instructions, performed the duties I assigned her, and did her job well. She never shirked any work assignments or tried to get out of doing work. I never had any complaints about her work or the way she performed her job. Frequently, I assigned [Plaintiff] to go to Court. I made the assignments of which deputies would go to Court, and I frequently assigned Ms. Taylor to that task. She did not select that task, but rather, I made those assignments."

Plaintiff also submitted her own affidavit, stating that she never said she would "hate" to work for Defendant or Ms. Payne, that she diligently performed her work "as instructed by Mr. Jefferson," and that if she went to court or performed "other tasks" it was at the specific instruction of Mr. Jefferson.

The other deputy clerks state that prior to December 31, 1992 the Clerk's office suffered from low morale and tension; however, after January 1, 1993 the disharmony disappeared and the office operated much more smoothly.

As noted before, after the run-off, Plaintiff congratulated Defendant and expressed the hope that they could get along. Defendant told Plaintiff that she "was not going to hold any grudges." Plaintiff's husband telephoned Defendant soon after that conversation, and Defendant indicated that her family had pressured her not to retain Plaintiff because Plaintiff had not supported her candidacy. Defendant told another person that, notwithstanding Defendant's statement during the radio debate, Plaintiff never took any initiative to demonstrate that she wished to remain employed by the Clerk's office. Defendant felt for a while after the election that "things were smoothed out" but later determined that "things were not smoothed out" from Plaintiff's perspective, because Plaintiff had supported the losing candidate.

On December 31, 1992 Defendant telephoned Plaintiff and said "[w]ell, I guess you've heard that I'm not going to rehire you[; w]ell it's true." Defendant states that she did not reach a final decision until that day.

Defendant completed a separation notice and termination papers which indicate that Plaintiff's performance in all areas was good to excellent. Defendant also stated that she would recommend Plaintiff without reservation. However, the record indicates that Defendant's statements on the separation papers may have been favorable so as not to harm Defendant's future employment chances.

In 1983 the Bartow County Commission passed a resolution to establish uniform personnel policies throughout county government, and stated that "[e]ach Elected Official has agreed to be governed by said plan." Mr. Jefferson, the Clerk of Superior Court in 1983, avers that he did not so agree. Moreover, Mr. Jefferson allowed employees, including Plaintiff, to accrue benefits and vacation time which were inconsistent with the county policies. Plaintiff, however, had received a copy of the personnel handbook and believed that the county policy applied to her. The county policy provided for a hearing before adverse employment action.

Plaintiff was not given notice of reasons for her termination, and was not given a pre- or post-termination hearing.

## STANDARD FOR SUMMARY JUDGMENT

■ Federal Rule of Civil Procedure 56(c) authorizes summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The moving party bears the heavy burden of demonstrating that no dispute as to any material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). This burden is met by "pointing out to the District Court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This initial burden remains with the moving party even when the issue involved is one on which the non-movant will bear the burden of proof at trial. *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir.1991).

■ Once the moving party has fulfilled its burden and shown that no factual issues exist which could warrant a trial, the burden shifts to the non-movant to come forward with specific facts showing that a genuine dispute still does exist. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark Inc.*, 929 F.2d 604 (11th Cir.1991). This burden shifts back to the non-moving party, however, *only* after the moving party meets its initial burden and shows that no factual issues remain for trial. *Russ*, 943 F.2d at 592. If the moving party does not meet its initial burden, the non-movant is not obligated to put forward additional evidence.

■ The District Court's duty is to view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir.1983). In deciding a motion for summary judgment, it is not the Court's function to decide issues of

genuine material fact. Rather, the Court's function is to determine whether such an issue exists to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). It is the applicable substantive law which identifies what facts are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Facts which in good faith are disputed, but which do not resolve or affect the outcome of the suit will not properly preclude the entry of summary judgment. *Id.* In short, such facts are not material. The materiality of a fact rests solely on the governing substantive law. A district court "can only grant summary judgment 'if everything in the record ... demonstrates that no genuine issue of material fact exists.'" *Tippens v. Celotex Corp.,* 805 F.2d 949, 952 (11th Cir.1986), (quoting *Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir.1980)).

 Genuine disputes are those where the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Moreover, for factual issues to be "genuine" they must have a real basis in the record. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 586, 106 S.Ct. at 1356 (citations omitted.) "[T]his standard mirrors the standard for a directed verdict.... [T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512.

### CONCLUSORY ALLEGATIONS AND "SPECIFIC FACTS"

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). "In fact, unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Vinson v. Fulton County Sheriff's Dept.,* 678 F.Supp. 275, 278–79 (N.D.Ga.1988) (quoting *Galindo v. Precision America Corp.,* 754 F.2d 1212, 1216 (5th Cir.1985) (quoting 10A Charles A. Wright, et al., *Federal Practice and Procedure* § 2738 (1983))). "Conclusory allegations by the non-moving party unsupported by specific facts have no probative value." *Pope v. Koppers Co.,* No. C85–26G, 1986 WL 12571, at *1 (N.D.Ga. Aug. 11, 1986); *see id.* at *2.

The Supreme Court recently spoke on the issue

In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Cf. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 [106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202] (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint'"), quoting *First National Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 290 [88 S.Ct. 1575, 1593, 20 L.Ed.2d 569] (1968). Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine

dispute as to specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

The Court stated that "at the margins" there is debate as to how specific facts must be. *Id.* at 889, 110 S.Ct. at 3189. However, the standard, which requires "evidence," indicates that the required level of specificity is higher rather than lower. A court may not grant summary judgment "if the *evidence* is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "[I]t is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that *sufficient evidence supporting the claimed factual dispute* be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *Id.* at 248–49, 106 S.Ct. at 2510 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569). Moreover, "if the evidence is *merely colorable* or is *not significantly probative,* summary judgment may be granted." *Id.* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (quoted in *Earley v. Champion Intern. Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990) (emphasis supplied).

■ The Court must "resolve all *reasonable* doubts in favor of the non-moving party," *Barnes v. Southwest Forest Indus., Inc.,* 814 F.2d 607, 609 (11th Cir.1987), but is "not required to resolve *all* doubts in such a manner." *Id.* at 609; *see also id.* at 610–11; *Earley,* 907 F.2d at 1080, 1082–83.

### PROCEDURAL DUE PROCESS[4]

■ The requirements of procedural due process must be met before an individual may be deprived of a property interest.

*Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

*Georgia Law*

"The governing authority of each county shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs and local government for which no provision has been made by local law and which is not inconsistent with this Constitution or any local law applicable thereto." Ga. Const. art. 9, § 2, ¶ 1(a). "The power granted to counties [by the language quoted] above shall not be construed to extend to the following matters or any other matters which the General Assembly by general law has preempted or may hereafter preempt ... (1) action affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority." Ga. Const. art. 9, § 2, ¶ 1(c)(1).

■ County commissioners, under the quoted Home Rule provisions, may establish civil service systems for persons employed by them, but may not take actions affecting personnel of another elected official. *Warren v. Walton,* 231 Ga. 495, 499, 202 S.E.2d 405 (1973) (deputy sheriffs). County commissioners had no power to affect employees of other elected county officials until the enactment of O.C.G.A. § 36–1–21 in 1986.[5] *Floyd v. Chaffin,* 201 Ga.App. 597, 597–98, 411 S.E.2d 570 (1991); *see Wayne County v. Herrin,* 210 Ga.App. 747, 750–51, 753–54 & n. 5, 437 S.E.2d 793 (1993), *cert. denied* (1994).

"Powers of all public officers are defined by law and all persons must take notice thereof. The public may not be estopped by the acts of any officer done in the exercise of

---

4. The following discussion of procedural due process is taken verbatim from the Court's previous order.

5. For reasons explained below, O.C.G.A. § 36–1–21 does not apply to this case.

an unconferred power." *Tate v. Teachers Retirement System*, 257 Ga. 365, 366, 359 S.E.2d 649 (1987); *Drost v. Robinson*, 194 Ga. 703, 710–11, 22 S.E.2d 475 (1942); O.C.G.A. § 45–6–5. The "powers of county commissioners are strictly limited by law, and they can do nothing except under express authority of law." *Warren*, 231 Ga. at 500, 202 S.E.2d 405. Without specific legislative authority the county governing authority may not adopt regulations applicable to employees of other elected officials. *Mobley v. Polk County*, 242 Ga. 798, 801, 251 S.E.2d 538 (1979) (citing Ga. Const. art. 9, § 2, ¶ 1(c)). "No matter how desirable uniformity of work regulations of various employees, of various county offices in the seat of government may be, county commissioners as the governing authority of the fiscal affairs of [the county] do not have authority, express or implied, to establish work regulations for employees of another elected county officer." *Id.* at 802, 251 S.E.2d 538.

"The clerks of the superior court shall have the power to appoint a deputy or deputies ... The deputies shall take the same oaths as the clerks do before entering upon the discharge of their duties. Their powers and duties shall be the same as those of the clerks, as long as their principals continue in office and not longer ..." O.C.G.A. § 15–6–59(b).

■■■■ Deputy clerks of superior court are not county employees, but the employees of the clerk of superior court. *See Herrin*, 210 Ga.App. at 753 & n. 5, 437 S.E.2d 793; *see also Drost*, 194 Ga. at 710–11, 22 S.E.2d

475; *Employees Retirement System v. Lewis*, 109 Ga.App. 476, 479–81, 136 S.E.2d 518 (1964), *disapproved on other grounds*, 240 Ga. 770, 243 S.E.2d 28 (1978).[6] A deputy clerk's job is dependant upon the will and reelection of the clerk of court. *See Hewatt v. Bonner*, 142 Ga.App. 442, 442–43, 236 S.E.2d 111 (1977) (deputy sheriff). "Thus, it is impossible for a deputy [clerk] to calculate with any degree of certainty when his employment will terminate." *See Id.* at 443, 236 S.E.2d 111 (citing *Drost*, 194 Ga. at 711, 22 S.E.2d 475, and *Lewis*, 109 Ga.App. at 480, 136 S.E.2d 518). This holding applies more compellingly to deputy clerks because the statute itself states that deputy clerks only serve during their principal's term.

■■■■ Without legislative authority, elected officials cannot guarantee terms of employment for employees. *See Hewatt*, 142 Ga. App. at 443, 236 S.E.2d 111. Prior to the adoption of § 36–1–21, Clerks of Superior Court had no authority to insure employment for their employees. *See Herrin*, 210 Ga. App. at 751–53, 437 S.E.2d 793; *Hewatt*, 142 Ga.App. at 443, 236 S.E.2d 111; *cf.* O.C.G.A. § 15–16–28 (providing that merit board for deputy sheriffs may be created if approved and adopted by sheriff); *but see* O.C.G.A. §§ 15–6–50 *et seq.* (no authority for clerks to establish such merit boards for their employees). An employee of another elected official cannot rely on procedures established by the county commission for county employees. *See Floyd*, 201 Ga.App. at 751, 411 S.E.2d 570 (sheriff had own procedures).

---

6. Although most cases deal with deputy sheriffs, the Court concludes that the analysis remains unchanged when the employee is a deputy clerk of court. The Clerk of Superior Court is a constitutional elective office like the sheriff. *See* Ga. Const. art. 9, § 1, ¶ 3(a). Both officers, statutorily, have sole power to appoint deputies. *Compare* O.C.G.A §§ 15–16–23 (conferring power to appoint deputies on sheriffs) *and* 15–6–59 (conferring power to appoint deputies on clerks of court). The Georgia Court of Appeals, in holding that a civil service system established pursuant to O.C.G.A. § 36–1–21 limits the sheriff's exclusive power, also expressly mentions clerks of superior court. *Herrin*, 210 Ga.App. 747, 753 n. 5, 437 S.E.2d 793 (1993). Also important to the courts is that the deputy sheriffs give a performance bond to the sheriff. *See, e.g., Warren*, 231 Ga.

495, 499, 202 S.E.2d 405. Likewise, deputy clerks give a performance bond to the Clerk. O.C.G.A. § 15–6–59(b). Moreover, the clerk statute, *unlike* the sheriff statute, states explicitly that deputy clerks retain their duties only so long as their principal does so. *See* O.C.G.A. § 15–6–59; *compare* O.C.G.A. § 15–16–23.

*Fulton County v. Spratlin*, 210 Ga. 447, 80 S.E.2d 780 (1954) and *Still v. Groover*, 224 Ga. 653, 164 S.E.2d 111 (1968) do not require a different result. Those cases concerned deputy clerks of Fulton County Superior Court. Fulton County, Georgia has a constitutionally based civil service system which specifically includes deputy clerks of superior court. *See Foster v. Brown*, 199 Ga. 444, 459, 34 S.E.2d 530 (1945); 1939 Ga. Laws 36 *carried forward by* Ga. Const. Appendix III (1983).

*Federal Law*

Whether a guarantee of employment sufficient to create a property interest "has been given can be determined only by an examination of the particular statute or ordinance in question." *Bishop v. Wood*, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (upholding lower court determination that, pursuant to state law, city ordinance created no right to continued employment). "In the context of public employment, the entitlement is generally created, if it is created at all, by state statute or individual contract." *Schneider v. Indian River Community College Foundation, Inc.*, 875 F.2d 1537, 1544 (11th Cir.1989) (citing *Bishop*, 426 U.S. 341, 96 S.Ct. 2074). "Less formal evidence of a property interest is acceptable if it shows 'mutually explicit understandings,' which may be implied from the circumstances of the employment." *Id.* (citing *Perry v. Sindermann*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972)).[7] "But such understandings or tacit agreements must support 'a *legitimate* claim of entitlement' under 'an independent source such as state law ...'" *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 224 n. 10, 106 S.Ct. 507, 513 n. 10, 88 L.Ed.2d 523 (1985) (emphasis supplied). Mutual understandings cannot create a property interest contrary to state law. *Warren v. Crawford*, 927 F.2d 559, 564 (11th Cir.1991) (citing *Batterton v. Texas Gen. Land Office*, 783 F.2d 1220, 1224 (5th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986)).

The creation of a merit system, in which an employee participates, creates a protected property interest. *Barnett v. Housing Auth. of Atlanta*, 707 F.2d 1571, 1576 (11th Cir.1983), *overruled on other grounds by*, *McKinney v. Pate*, 20 F.3d 1550, 1555–56 (11th Cir.1994) (en banc decision overruling prior case law); *Wayne*, 210 Ga. App. at 754, 437 S.E.2d 793; *Clark & Ste-*

*phenson v. State Personnel Bd.*, 252 Ga. 548, 550, 314 S.E.2d 658 (1984).

A written policy requiring certain ratification procedures to be effective creates no property interest if those procedures have not been completed. *Adams v. Bainbridge-Decatur County Hosp. Auth.*, 888 F.2d 1356, 1366 (11th Cir.1989). The mere presence of an employee handbook does not create a property interest, if state law does not support the creation of such interest. *United Steelworkers of America v. University of Alabama*, 599 F.2d 56, 60 (5th Cir.1979). Even if a plaintiff is given an employee handbook, if the handbook does not apply to plaintiff, it creates no property interest. *See Warren*, 927 F.2d at 562–564.

The presence of a handbook and internally administered personnel policies does not under Georgia law transform an at-will employee into a contract employee. *Garmon v. Health Group of Atlanta, Inc.*, 183 Ga.App. 587, 589, 359 S.E.2d 450 (1987) (cited in *Wofford v. Glynn Brunswick Mem. Hosp.*, 864 F.2d 117, 119–20 (11th Cir.1989). Internally administered personnel policies do not create a property interest in a job. *Wofford v. Glynn Brunswick Mem. Hosp.*, 864 F.2d 117, 119–20 (11th Cir.1989) (citing *Garmon v. Health Group of Atlanta, Inc.*, 183 Ga.App. 587, 589, 359 S.E.2d 450 (1987)).

*Discussion*

The parties disagree about whether Plaintiff has a property interest under Georgia law, but their arguments focus on O.C.G.A. § 36-1-21. That statute allows counties to create civil service systems by ordinance, rather than requiring special local legislation. The court notes that § 36-1-21 was enacted in 1986, three years *after* Bartow County purported to create a personnel

---

7. The plaintiffs in *Schneider* participated in a pension plan subject to vesting in ten years, received a employment handbook referring to employment as Career Service and argued that there was an unwritten custom or law of continued employment. There was also a statute requiring the defendant to hire pursuant to written contract. The court of appeals held the unwrit-

ten custom or policy was not a mutually explicit understanding such as the informal tenure system in *Perry*. This Court notes that, under the facts of *Perry*, a tenure system, informal or formal, would not have violated the law since the Texas university system had a tenure system. *See Perry*, 408 U.S. at 600, 92 S.Ct. at 2699.

policy; therefore, the section does not apply to this case.[8]

■ Plaintiff argues that the County Clerk stated that the county policy applied to employees of the Clerk of Court and that the employees received a handbook. Plaintiff states that she understood the policies to apply to her. Plaintiff also argues that the County Commission's 1983 resolution states that "each elected department head has agreed to be governed by said plan." Defendants argue that the resolution statement is a typographical error, that the Clerk of Court did not agree to be bound, that the policies were not followed, and that state law declares that deputy clerks serve at the will of the Clerk of Court.

The Court concludes that Plaintiff had no property interest in her position. Prior to the enactment of O.C.G.A. § 36–1–21 in 1986, Georgia law was devoid of any means whereby a Clerk of Superior Court could adopt a merit system or personnel policy, or provide a guarantee of employment status sufficient to create a property interest in the deputy clerk position. A Clerk was without authority to do so, and the statute explicitly states that deputy clerks serve only during the tenure of their principal. The Court notes that such language is absent from the parallel statute on deputy sheriffs and makes the cases concerning deputy sheriffs more compelling in situations involving deputy clerks of court. *Any* attempt by a Clerk to assure employment status to a deputy clerk would have violated Georgia law, and the guarantee would have been void and unenforceable;

therefore no such guarantee could create a property interest.

The Court concludes that, under pre–1986 law, the county commission had no power to provide any type of employment status guarantee to deputy clerks of court. The deputy clerks were personnel of another elected official, and a general statute provided Clerks of Superior Court with sole authority over the deputies.

The fact that Plaintiff received a personnel manual does not create a property interest because that manual could not have applied to Plaintiff despite any representations to the contrary. The statute authorizing Plaintiff's position stated such, and Plaintiff is charged with notice of that state law. The personnel manual, to the extent it could have any force whatever, is no more than an internally administered policy of the Clerk of Superior Court like that at issue in *Wofford.* 864 F.2d at 119–20. Again, the Court concludes that such a policy creates no property interest.[9]

### SUBSTANTIVE DUE PROCESS

■ The theory of substantive due process provides no claim for violation of state created rights. *McKinney v. Pate,* 20 F.3d 1550, 1555–56 (11th Cir.1994) (en banc decision overruling prior case law).

Plaintiff's First Amendment rights are incorporated into the Fourteenth Amendment's due process clause to protect her against state action. *McKinney v. Pate,* 985 F.2d 1502, 1509 & n. 5 (11th Cir.1993) (Tjoflat, J., specially concurring in panel decision) (surveying circuit cases), *rev'd in part and aff'd in part,* 20 F.3d 1550 (11th Cir.1994) (en

---

**8.** The Court notes that even if section 36–1–21 applied, the result would be the same as reached below. In order for employees of other elected officials to be brought under the civil service system created by ordinance, the county commission must pass a second enabling ordinance and the elected department head must make written application. *See* O.C.G.A. § 36–1–21(b); *Herrin,* 210 Ga.App. at 750, 437 S.E.2d 793; *Burbridge v. Hensley,* 194 Ga.App. 523, 525, 391 S.E.2d 5, *cert. denied* (1990). In this case, neither the second enabling ordinance nor the written application by the Clerk of Court occurred.

**9.** Cases in which the handbook or personnel policy was or could be lawfully established and the issue is simply whether it applies to the

particular employee are inapposite to this case. *See Crowell v. Eastman,* 859 F.2d 875, 877–78 (11th Cir.1988) (personnel policy lawfully adopted; issue as to whether policy applied to plaintiff; court did not address whether city charter could override personnel policy on plaintiff's position); *Nicholson v. Gant,* 816 F.2d 591, 597 (11th Cir.1987) (personnel policy lawfully adopted and applicable to plaintiff's position); *Whitfield v. Finn,* 731 F.2d 1506, 1508 (11th Cir.1984) (one page sheet of regulations signed by police chief; issue as to whether parties understood regulations to apply to plaintiff); *Glenn v. Newman,* 614 F.2d 467, 470–72 (5th Cir.1980) (personnel procedures lawfully adopted and applicable to plaintiff).

banc). However, these claims will be analyzed within the First Amendment framework, and not as an independent substantive due process violation. *See Collins v. City of Harker Heights,* —— U.S. ——, —— – ——, 112 S.Ct. 1061, 1068–69, 117 L.Ed.2d 261 (1992).

## FIRST AMENDMENT CLAIMS

*Political Patronage Theory and Terry v. Cook*

 In the original round of motions Plaintiff argued that this case should be evaluated as a political patronage case using the principles of *Rutan v. Republican Party,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Plaintiff moved for partial summary judgment based upon those principles. Defendants argued that this case should be evaluated under the free expression principles of *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Court noted that there was a circuit split on how to evaluate the issue, but that the Eleventh Circuit provided clear guidance in *Terry v. Cook.* 866 F.2d 373, 376–77 (11th Cir.1989).[10]

The Eleventh Circuit, while acknowledging that overlap may occur, emphasized the need to "retain the distinctions between" the two types of cases. *Terry,* 866 F.2d at 377. Although the Eleventh Circuit has not developed a bright-line numerical test to distinguish them, it appears that the political patronage analysis applies to situations involving an *en masse* discharge, while the *Pickering/Connick* balancing test applies when only a single employee is affected. *See Terry,* 866 F.2d at 376, 377; *see also id.* at 376 (favorably citing *Joyner v. Lancaster,* 815 F.2d 20 (4th Cir.1987)). *Compare Stough v. Gallagher,* 967 F.2d 1523, 1527–29 (11th Cir.1992). *See also* Craig D. Singer, Comment, *Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Affiliation,* 59 U.Chi.L.Rev. 897, at n. 62 and accompanying text (1992). The Court concludes that the *Pickering/Connick* analysis is appropriate in this case. *See Stough,* 967 F.2d at 1527–29.[11]

The Court further concludes that this case is not one where the lines of precedent overlap because at lease at least one other deputy clerk actively campaigned for one of Defendant Johnson's opponents and several others did not support Defendant. Those deputy clerks, however, continue to work for Defendant. Therefore, even if the *Elrod/Branti/Rutan* line could apply in a situation involving one employee, it does not apply in this case. The Court concludes that this case does not involve an elected official punishing those who supported her opponent. If the two lines of precedent are to remain distinct, the political patronage line cannot apply in a situation, such as this, where an official terminates one employee, and retains another, both of whom worked against her.[12]

In her brief requesting reconsideration of the Court's previous order, Plaintiff argues that the Court misread *Terry* and imposed a numerical test for determining when *Elrod/Branti* applies.[13] The Plaintiff argues that the Court improperly "found" that *Elrod* and *Branti* because there was "no evidence that Lovell's allegiance to a political party or candidate was a basis for dismissal." *Id.* at 1375. In this case the presence of the other deputy clerk who worked against Defendant makes the application of *Elrod/Branti/Rutan* inappropriate.

---

**10.** The following two paragraphs are essentially the same conclusion reached by the Court in the previous order.

**11.** Plaintiff complains that *Stough,* although reaching the correct result, erroneously applied *Pickering* instead of *Elrod.* The Court concludes, however, that because *Stough* and *Joyner* apply *Pickering,* and *Terry* favorably cites *Joyner,* the Court's conclusion that this case does not involve "raw political patronage" is correct.

**12.** This result is consistent with *Lovell v. Floyd County,* 710 F.Supp. 1364 (N.D.Ga.1989) (Murphy, J.). In *Lovell* the Court declined to apply

**13.** This argument is meritless. The Court *noted* that it appears that *Elrod/Branti* does not apply to a single employee, but *held* that it does not apply to the facts of this case, because other employees supported Defendant's opponents and were not terminated.

speech and not political association motivated Plaintiff's discharge. Plaintiff urges the Court to follow the Fourth Circuit case of *Jones v. Dodson,* 727 F.2d 1329 (4th Cir. 1984). The Court concludes that a close examination of *Jones* and the later Fourth Circuit case of *Joyner v. Lancaster,* both cited by the Eleventh Circuit in *Terry,* forecloses Plaintiff's argument.

Plaintiff extensively quotes the *Jones* discussion that when a factual question arises as to the actual motivation for a termination—political patronage or speech—such is a threshold issue for a jury. Plaintiff ignores, however, the Fourth Circuit's particular holding with regard to each plaintiff in the case. Defendant terminated one plaintiff with the statement "since you have been campaigning against me I must in all good faith to the Republican Party and myself release you from duty." *Jones,* 727 F.2d at 1331. There was also evidence that some of that plaintiff's campaign activities were improper. *Id.* at 1338. With regard to a second plaintiff the only evidence of politically motivated firing was plaintiff's satisfactory performance up to the time of the precipitating altercation with defendant, and that plaintiff belonged to the other political party. *Id.* at 1339.

The court held as to the first plaintiff that if there were both political affiliation and free expression reasons for discharge, *Pickering* balancing must be applied, not the *Elrod/Branti* strict scrutiny test, and remanded for such determination. *Id.* at 1339. As to the second plaintiff, the Court held that as a matter of law the evidence was insufficient to get to a jury on the issue of motivation. *Id.*

In *Terry* the Eleventh Circuit character-ized *Jones* as holding that "raw political patronage discharge of *Elrod/Branti* type properly treated as narrow, special cases; such analysis *not* suited to *"personal political loyalty"* situations or to employee "expressions" involving insubordination or dereliction of duty having "political" tinge, or, conceivably, deliberately given a "political" cloak. *Terry,* 866 F.2d at 375–77 (citing *Jones,* 727 F.2d at 1334 n. 6) (emphasis supplied).

Plaintiff fails to cite *Joyner v. Lancaster,* a later Fourth Circuit case also cited in *Terry.*

*Joyner* involved a deputy sheriff who was not alone in supporting defendant's opponent, but was the most open, loud, and overt. He campaigned on and off duty, handed out literature, put up yard signs and encouraged people he knew to vote for defendant's opponent. His activities caused "distrust and plummeting morale." The court noted that "[t]here is no question in this case that Joyner's *political activity* was the cause of his discharge." 815 F.2d 20, 22 (4th Cir.1987) (emphasis supplied). The court also cited *Jones v. Dodson.* The court, however, never mentioned *Elrod* or *Branti,* obviously concluding that the case was so clearly one not involving "raw political patronage." The court analyzed the plaintiff's claims using *Pickering* and resolved the *Pickering* test in defendants' favor. *Id.* at 23–24. The case before the Court is almost identical to *Joyner.*

Plaintiff points to two statements arguing that "defendants admit this is indeed a political patronage case." Defendants stated that "[t]he decision not to hire the Plaintiff was based on Plaintiff's unwillingness to work under the new administration as [sic] loyal and trusted employee" and "[d]efendant decided not to hire Plaintiff under her administration because she did not feel Plaintiff could be trusted, or that she would act as [sic] member of a cooperative effort."

The Court concludes that its holding in the previous order, reentered above, that this is not a "raw political patronage" case is correct. At most the statements place this case in the category of "personal, political loyalty" cases which the Eleventh Circuit has stated are not subject to *Elrod/Branti* analysis. *Terry,* 866 F.2d at 377 (citing *Jones v. Dodson,* 727 F.2d 1329, 1334 n. 6 (4th Cir.1984); *see also Joyner,* 815 F.2d 20 (cited in *Terry,* 866 F.2d at 376). It is undisputed that other deputy clerks failed to support Defendant Johnson or supported her opponents, and that Defendant at least felt such to be the situation. These other clerks were reappointed. As the Court noted above, whether Defendant had actual knowledge of the others activities, or the extent thereof, is not material to whether this is a "raw political patronage" case.

Plaintiff points to statements in the record in which Defendant told others that her family was pressuring her to terminate Plaintiff because Plaintiff supported Mr. Stewart. The Court, however, must look to the entire record and not merely isolated statements. The Court concludes that the entire record demonstrates that this is not a "raw political patronage" case. The statements by Defendant regarding her family, in the context of this case, are evidence that Plaintiff's protected speech was a substantial or motivating factor in her termination.

Plaintiff argues that the Court made improper credibility determinations, citing *Rollins v. Tech South, Inc.*, 833 F.2d 1525, 1531 (11th Cir.1987). The Court concludes that *Rollins* is inapposite because that case involved a sham affidavit argument. The Court concludes, not that Plaintiff's averments are not credible, but that they are broad conclusory allegations insufficient to avoid summary judgment.

■■■ Plaintiff argues that the Court determined Defendant's motive for terminating Plaintiff based on an insufficient record. *See Searcey v. Crim*, 815 F.2d 1389, 1393 (11th Cir.1987). *Searcey* involved an issue of whether defendants had created a public forum and then denied plaintiffs access thereto. The record before the trial court contained little information on the nature and use of the forum at issue. In this case, however, the record of the events is sufficiently developed in order to rule on a summary judgment motion. Plaintiff may not submit broad conclusory affidavits and use them to argue that the record is insufficient. Plaintiff made no attempt to move under Rule 56(f) to continue this motion pending production of additional evidence. The Court agrees that the record, from Plaintiff's perspective, is insufficiently developed; however, that simply means that Plaintiff has insufficient specific facts to support her position.

*A Mixed Motive Case?*

■■■ Even if the Court erred in concluding that this case represents a pure *Pickering* case, the *Pickering* test is still the appropriate analytical tool. The Court concludes that it is not a close question as to whether Plaintiff was terminated *solely* for her political beliefs and not for expressive conduct. At best she has a mixed motive case, in which she was terminated for both expression and affiliation, which case is still subject to *Pickering* balancing. *Jones v. Dodson*, 727 F.2d 1329, 1338–9 (4th Cir.1984) (if employee discharged for party affiliation and specific political activity then defendants' conduct subject to justification under *Pickering–Givhan–Connick*, not *Branti* ) (favorably cited in *Terry*, 866 F.2d at 377); *Stough v. Gallagher*, 967 F.2d 1523, 1527–28 (11th Cir. 1992).

### THE PICKERING TEST

#### Threshold Issue—Public Concern

■■■ As a threshold issue, the Court must determine, "whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir.1993), *reh'g en banc denied*, 15 F.3d 1099 (1994) (citations omitted); *Ferrara v. Mills*, 781 F.2d 1508, 1512, 1515 (11th Cir. 1986) (citing *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983)). In making this determination the Court looks to "the content, form, and context of the given statement, as revealed by the whole record." *Ferrara*, 781 F.2d at 1512.

■■■ "A court must therefore discern the purpose of the employee's speech—that is, whether he spoke on behalf of the public as a citizen, or whether the employee spoke for himself as an employee." *Id.* The Court "must determine whether the purpose of [the employee's] speech was to raise issues of public concern, on the one hand, or to further his own private interest, on the other." *Id.* The employee's efforts to communicate the concerns to the public and the employee's motivation in expressing the concerns are relevant considerations. *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir.1988); *Morgan*, 6 F.3d at 754 & n. 5. The purpose of the threshold requirement is "to prevent the federal courts from becoming 'a roundtable for employee complaints over internal office af-

fairs.'" *Kurtz,* 855 F.2d at 727 (quoting *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Statements which touch both public and personal concerns are considered public concerns for purposes of the threshold issue. *Id.*

*The* Pickering *Balance*

■ If the Court determines that plaintiff's speech involves a matter of public concern, the Court must apply the balancing test established in *Pickering v. Board of Education. Ferrara,* 781 F.2d at 1512; *Kurtz,* 855 F.2d at 730. The Court must balance "the interest of the [employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

■ In evaluating this issue the Court looks at a number of factors: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently, including whether the speech (a) thwarts the mission of the agency, (b) impedes the performance of the speaker's duties, (c) has a detrimental impact on close working relationships, (d) destroys harmony among co-workers; (2) the manner, time and place of the speech, including (a) choice of words, (b) whether publicly or privately spoken, (c) whether spoken in the work place and (d) the forum and method used; and (3) the context within which the speech is made, including (a) whether the speech is based solely on an interest in improving the performance of the office or whether it arises out of ongoing personnel disputes, (b) the potential for future disruption of the workplace, and (c) the degree of public interest. *See Connick,* 461 U.S. at 151–55, 103 S.Ct. at 1692–94; *Morales v. Stierheim,* 848 F.2d 1145 at 1149–50 (11th Cir.1988); *Maples,* 858 F.2d at 1553–54; *Ferrara,* 781 F.2d at 1512–14.

■ If the employee's speech involves both public and personal concerns, the Court takes the presence of personal non-protected speech into account in the *Pickering* balance. *Kurtz,* 855 F.2d at 732–33.

■ The Court may not take a single document or expression and break it down into protected and unprotected components. *Eiland v. Montgomery,* 797 F.2d 953, 957 (11th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). However, when the "'speech' consist[s] of many different oral statements, memoranda, and letters published over a period of several years, it would be reasonable for the district court to separate those instances of speech which clearly do not relate to a matter of public concern from those which do for the purposes of applying the *Pickering* balancing test and presenting the causation issues to the jury under *Mt. Healthy.*" *Kurtz,* 855 F.2d at 732.

In the *Pickering* balancing, an employee "may not use those instances of speech which on their face do not relate to matters of public concern in attempting to make his showing that his speech was a substantial or motivating factor in the university's failure to promote him ... [the employers], however, if they desire, may use any such speech in attempting to show that [the employee] was dismissed for reasons other than his protected speech." *Kurtz,* 855 F.2d at 733.[14]

■ The *Connick* and *Pickering* issues are questions of law for the Court to decide, while the *Mt. Healthy* issues are questions of fact. *Maples,* 858 F.2d at 1552 & n. 10. As indicated above, no bright lines exist in evaluating the legal questions, and such evaluation is done on a case by case basis. *See Ferrara,* 781 F.2d at 1513 n. 5 (quoting *Pickering,* 391 U.S. at 569, 88 S.Ct. at 1735); *Maples* 858 F.2d at 1552.

*The* Mt. Healthy *Causation Questions*

■ The employee must show that the protected speech was a substantial or motivating factor in the adverse employment de-

---

14. The Court notes that the language used by the court of appeals is similar to the causation language of *Mt. Healthy.* The issue, however, in the

quoted portion of *Kurtz* and the cited portion of *Eiland* was the *Pickering* balancing test.

cision. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The employer must then prove that it would have made the same employment decision in the absence of the protected conduct. *Id.*[15]

*Discussion*

 Defendants argue that, although Plaintiff's speech touched on a matter of public concern, the time, manner and place of the speech renders it unprotected. Defendants argue specifically that Plaintiff's denigration of Defendant at work to employees and customers; her campaigning at work; her refusal to effectively communicate with other deputies after the election; her statement that she would not work for Defendant if Defendant were elected; and her leaving the office when there was work to be done all render her speech unprotected. Plaintiff argues that numerous factual issues remain regarding the content, manner and effect of her statements. Citing Justice Powell's concurrence in *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315, (1987) Plaintiff argues that any speech in which she engaged was isolated private remarks for which she could not be terminated.

The Court concludes that Plaintiff's speech as a whole and the impact thereof in the clerk's office render the speech unprotected. It is undisputed that Plaintiff engaged in some improper campaign activities, including soliciting votes during working hours from fellow employees and others using the courthouse. The Court concludes that such improper campaign activity weighs against Plaintiff in the *Pickering* balance. The Court also concludes that Plaintiff's behavior toward the other deputy clerks and her statement that she would not work for Defendant, detrimentally impacted the close working relationships of Defendants' office.

Mr. Stewart's acknowledgment that Plaintiff would have been his Chief Deputy injects an element of personal interest on Plaintiff's part into the case. The Court notes, that while Mr. Stewart's acknowledgment does not render Plaintiff's conduct personal so as to remove it from the realm of *Connick* public concern, it weighs against her in the *Pickering* analysis.

It is undisputed that Plaintiff stated that she would not work for Defendant if Defendant were elected.[16] Finally it is undisputed, other than by Plaintiff's broad and conclusory statements to the contrary, that communication between Plaintiff and the other clerks became difficult; that Plaintiff was at times hostile to other clerks, including reducing Ms. Payne to tears; that Plaintiff avoided contact with the other clerks, specifically, walking around the office to avoid passing Ms. Payne's desk, and refusing to speak to the other clerks at Mr. Jefferson's retirement party; and that at times Plaintiff just left the office when there was work to be done or a backlog.[17] Finally it is undisputed that the clerks office operated in an atmo-

15. The cases are not uniform in whether the *Pickering* balance is first evaluated and then the employee's *Mt. Healthy* causation showing, or vice versa. *Compare Kurtz v. Vickrey,* 855 F.2d 723, 730–31 (11th Cir.1988) *with Maples v. Martin,* 858 F.2d 1546, 1552 (11th Cir.1988). For purposes of summary judgment, assuming causation and evaluating the *Pickering* issue first is appropriate, because the *Connick* threshold issue and *Pickering* issue are questions of law, while the *Mt. Healthy* issues are fact questions. Moreover, the Defendant's comments regarding her family's pressure on her to terminate Plaintiff render unnecessary an assumption of causation.

16. Although there is an issue of fact as to whether Plaintiff stated that she would "hate" to work for Defendant, the undisputed statement that she would not work for Defendant renders this issue of fact immaterial. *See Bennet v. Parker,* 898 F.2d 1530, 1532 (11th Cir.1990).

17. Plaintiff raised an issue of fact regarding whether she went to court other than by direction of Mr. Jefferson. It is undisputed, however, that she also left the office to go across the hall to talk, or for purposes other than going to court. Mr. Jefferson's affidavit does not create a fact issue to the contrary. It merely states that she performed the assignments given to her by Mr. Jefferson. To the extent that Plaintiff intends the affidavit to counter the other deputies' averments, it is not based on personal knowledge. The affidavit states in the next sentence that Mr. Jefferson never heard complaints about Plaintiff's work. There are no specific facts in the record controverting the specific facts contained in the other deputies' affidavits. *See Lujan,* 497 U.S. at 888, 110 S.Ct. at 3188.

sphere of tension prior to January 1, 1991, which tense atmosphere dissipated thereafter. It is undisputed that the only material change was Plaintiff's absence.

In short, the Court concludes that, although Plaintiff's own performance was not impacted by Plaintiff's conduct, that conduct seriously effected relationships, and made the maintenance of a harmonious environment impossible. The Court also concludes that there was great potential for future disruption in the small office.

Plaintiff makes much of her favorable termination notice from Defendant. After reviewing Defendants' arguments, the Court concludes that Defendants do not argue that Plaintiff was fired for her poor performance. Defendants' argue that because of Plaintiff's attitude and actions the performance of the entire office suffered. Plaintiff's attitude, perceived inability, and undisputed unwillingness, to function in Defendant's administration was the reason for her termination. In these cases, Plaintiff's individual performance does not have to suffer to justify termination. *See Johnsen v. Independent Sch. Dist. No. 3 of Tulsa County,* 891 F.2d 1485, 1493 (10th Cir.1989).[18] Such performance is merely a factor in the *Pickering* balance. *See, supra* at p. 1542.

### MT. HEALTHY *OR* PICKERING

One aspect of this case that concerned the Court and which it ordered rebriefed was whether the presence of unprotected speech was analyzed in the *Pickering* test or whether it required a *Mt. Healthy* factual determination. Implicit in Plaintiff's arguments is that if Plaintiff's protected speech was a substantial or motivating factor in her termination, summary judgment must be denied. Defendants argue that the non-protected speech and activities weigh against the Plaintiff in the *Pickering* analysis because those instances are related to the protected speech.

If the multiple instances of speech are unrelated, the issue is whether Defendant would have terminated Plaintiff even in the absence of protected speech. *Mt. Healthy,* 429 U.S. at 281–82, 287, 97 S.Ct. at 573–74, 576. However, when the instances of speech are sufficiently related, the issue requires *Pickering* analysis. *See Bryson v. City of Waycross,* 888 F.2d 1562, 1565–66 (11th Cir. 1989); *Berry v. Bailey,* 726 F.2d 670, 675–76 (11th Cir.1984); *Eiland v. City of Montgomery,* 797 F.2d 953, 957 n. 6 (11th Cir.1986); *see also Kurtz v. Vickrey,* 855 F.2d 723, 733 (11th Cir.1988).

The Court concludes that the context of Plaintiff's speech and actions are such that the protected and unprotected are subject to the *Pickering* analysis. All the speech and actions revolved around the campaign and election. But for the campaign and election, none of the speech or actions would have occurred. There would have been no proper or improper campaign activity, no statements that Plaintiff would not work for Defendant, no statements about Defendant's qualifications for office, no discomfort among the other deputy clerks, and none of the other speech or actions at issue in the case.

### QUALIFIED IMMUNITY

"The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms...." *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989) (citations omitted). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* "The qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

"Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is enti-

---

18. Plaintiff's primary purpose for this argument was to raise a question of fact regarding Defendant's true motivation for terminating her and thus attempt to obtain *Elrod/Branti* treatment. As the Court concluded above this case is not subject to that analysis. And as the Court noted, even if party (or candidate) affiliation played a part in Plaintiff's termination, the record is clear that it was not the *sole* reason, and therefore this case is not subject to *Elrod/Branti* analysis.

tled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Id.*

Defendants argue that the cumulative impact of Plaintiff's actions were disruptive and Defendant could reasonably have believed that Plaintiff's continued presence would undermine the office. Defendants also note that the Court referred to the issue as one of first impression.[19] Plaintiff argues that her speech was protected, that she was terminated for that speech and for political affiliation, and that is contrary to clearly established law.

The Court concludes that *Dartland* is instructive in this case. The speech in that case had an element of personal interest and created disharmony in the office. The court concluded that a reasonable supervisor could conclude that, although the at-will employee's speech was protected, that it undermined the supervisor's authority and "evidenced contempt for the policy choices of the [supervisor] as well as personal ill will toward the [supervisor].... [and] arguably undercut the proper functioning of the [government] office." *Dartland*, 866 F.2d at 1324.

The Court concludes that the Plaintiff may not avoid the qualified immunity defense by broadly worded references to First Amendment liberties. The issue is whether given the facts of this case—Plaintiff's support of an opponent, Plaintiff's engaging in proper and improper campaign activities, Plaintiff's attitude and behavior after the election—a reasonable public employer would know it was against clearly established law to discharge the employee. For the reasons outlined above in the *Pickering* discussion the Court concludes that the Defendant is entitled to qualified immunity. Moreover, even if the Court had misanalyzed the *Pickering* test, the test certainly would not "lead to the inevitable conclusion that the discharge of [Plaintiff] was unlawful." *Dartland*, 866 F.2d at 1323.

19. The Court, unfortunately, had failed to locate *Kurtz v. Vickrey*, 855 F.2d 723, 732 (11th Cir. 1988); and *Eiland v. City of Montgomery*, 797 F.2d 953, 957 (11th Cir.1986), *cert. denied*, 483

*CONCLUSION*

Accordingly the Court **VACATES** its order of March 15, 1994, **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendants' Motions for Summary Judgment, and **DISMISSES** Plaintiff's claims.

IT IS SO ORDERED.

U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). These two cases addressed the particular legal questions posed by the Court.